1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

DAVID DION WATKINS,

Civil No.          07-0196 W (POR)

11

Petitioner,

12

vs.

**REPORT AND RECOMMENDATION
RE: DENYING PETITION FOR WRIT
OF HABEAS CORPUS**

13

L.E. SCRIBNER, et al.,

14

Respondents.

15
16

I.    **INTRODUCTION**

17

    David Dion Watkins,[1] a state prisoner proceeding pro se, has filed a Petition for Writ of Habeas

18

Corpus pursuant to 28 U.S.C. § 2254 challenging his San Diego County Superior Court conviction in

19

case number SCD163340 for one count of murder, one count of robbery, one count of willful cruelty

20

to an elder and one count of burglary.  (Lodgment No. 2, vol. 3 at 0722-26.)  He contends his federal

21

constitutional rights were violated when the prosecutor committed misconduct by presenting false

22

reports and perjured testimony; his trial and appellate attorneys were ineffective when they failed to

23

challenge this false and perjured evidence; failed to impeach a detective who sent an allegedly improper

24

letter to the DNA lab, and failed to investigate and present evidence of unidentified blood on Watkins'

25

clothing; the prosecutor improperly excluded African Americans from his jury; the trial court improperly

26

refused to instruct on the defense of voluntary intoxication and improperly instructed the jury on the

27
28

    [1]   The state court filings in this case refer to Petitioner as "David Dean Watkins, a.k.a. David Dion Watkins," but Petitioner refers to himself as "David Dion Watkins."

1   felony murder charge; and, the admission of his statements to police violated his Fifth Amendment right

2   against self-incrimination.  (Petition ("Pet.") at 6-9, 12-28.[2])

3   　　　　The Court has considered the Petition, Respondents' Answer and Memorandum of Points and

4   Authorities in Support Thereof (hereinafter "Resp'ts Mem."), Petitioner's Traverse and all the

5   supporting documents submitted by the parties.  Based upon the documents and evidence presented in

6   this case, and for the reasons set forth below, the Court recommends that the Petition be **DENIED**.

7   **II.     FACTUAL BACKGROUND**

8   　　　　This Court gives deference to state court findings of fact and presumes them to be correct;

9   Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  28

10  U.S.C. § 2254(e)(1)(West 2007); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings

11  of historical fact, including inferences properly drawn from such facts, are entitled to statutory

12  presumption of correctness).  The facts as found by the state appellate court are as follows:

13  　　　　On October 20, 2001, Watkins killed 82-year-old widow Lillie Mae Brown, for
    whom he had occasionally done odd jobs, by repeatedly stabbing and strangling her.

14  Tsige Fesseha, who lived at Brown's home at the time, called the police after finding
    Brown's body on the floor of the master bedroom when she returned home from work

15  early that evening.  Although the responding officers found no sign of forced entry, the
    house was in disarray, with jewelry boxes and drawers ransacked and their contents

16  spilled on the bed and the floors.  The officers took fingerprints, later identified as
    Watkins's, from a bathroom counter and toilet, a jar, a telephone in the master bedroom

17  and jewelry boxes in the house.  They found a jacket, also belonging to Watkins, on the
    dining room floor.

18

19  　　　　The next morning, a friend of Watkins told police that Watkins had tried to sell
    her some jewelry late the prior evening.  Detectives James Hergenroether and Michael

20  Ott arrested Watkins on an outstanding misdemeanor warrant and took him to police
    headquarters for questioning.  At the outset of the interview, which was audio and video

21  taped, Watkins told the detectives that he had been drinking "a lot" of beer and had
    smoked crack cocaine shortly before his arrest.  Before advising Watkins of his rights

22  in accordance with *Miranda v. Arizona*, (1966) 384 U.S. 436 (*Miranda*), Detective
    Hergenroether asked him whether he had been trying to sell some jewelry the night

23  before.  After Watkins denied having any jewelry, the officers told him that other people
    had told them the contrary.

24  　　　　At that point, Detective Hergenroether gave Watkins a *Miranda* advisement
    before continuing with the questioning.  Watkins indicated that he understood his rights

25  and Detective Hergenroether asked whether he was willing to give "[h]is side of the
    story on this . . . jewelry thing."  Watkins continued to talk to the officers, initially

26  denying that he knew about or had any jewelry.  He told them that he was one of a few
    people Brown would allow in her house and admitted that he had done some yard work

27

28  　　　　[2]  The Court has renumbered the pages of Watkins' petition sequentially to aid in referring to the proper
    pages.

for Brown and been in her home on the previous afternoon. He later indicated that a man known as "Cigarette Man" (a.k.a. James Lauderdale) had given him jewelry and a couple of clocks to sell and that he had sold some of the items for crack cocaine. He consistently maintained, however, that he did not kill Brown.

Watkins volunteered to take the detectives to his girlfriend's apartment, where they recovered numerous pieces of jewelry, a clock and other items that had belonged to Brown. After the officers returned to the station with Watkins and recommenced questioning, Watkins made several requests to talk to a lawyer. Shortly thereafter (although not immediately), the officers stopped their interrogation. Several hours later, officers had Watkins's blood and urine tested for the presence of alcohol or drugs; the test results showed that Watkins had a blood alcohol level of .11 to .12 and had cocaine, phencyclidine (PCP) and metabolites in his system.

The district attorney charged Watkins with murder, rape by foreign object, first-degree robbery, willful cruelty to an elder resulting in great bodily injury or death and residential burglary. In connection with the murder count, the information alleged two special circumstances, that Watkins committed the murder while engaged in a robbery or while engaged in a burglary. As to certain other counts, it also alleged that Watkins had personally used a deadly weapon and had committed those crimes against an elderly person. The prosecutor elected to pursue the death penalty against Watkins.

Prior to trial, the court granted Watkins's motion to suppress his statements made to police before being given the *Miranda* advisement and those he made after asking for an attorney. The court, however, also found that after being advised of his rights, Watkins knowingly and intentionally waived those rights and thus statements made thereafter (but before the request for an attorney) were admissible.

At trial, the prosecutor introduced evidence of the events surrounding Brown's death. In his defense, Watkins introduced evidence that he had Brown's jewelry in the early afternoon of October 20, hours before Brown was killed, and that he was a nonviolent person. Watkins also introduced expert testimony that he had an IQ of 69 and suffered from brain impairment, perhaps resulting from long-term drug and alcohol use, that limited his ability to control his "short-range impulses." He requested that the trial court instruct the jury regarding the consequences of being intoxicated or under the influence of drugs, but the court declined to do so on the ground that there was not evidence to show that Watkins was in that condition at the time he committed the offense.

The jury convicted Watkins of all counts other than rape with a foreign object and found true the special circumstance and remaining allegations. During the penalty phase, the jury recommended that the court sentence Watkins to life without the possibility of parole rather than death on the murder count. The court thereafter imposed the recommended sentence, plus an additional year for personal use of a deadly weapon, and stayed sentence on all remaining counts.

(Lodgment No. 7 at 2-5.)

### III.   **PROCEDURAL BACKGROUND**

On May 9, 2002, the San Diego County District Attorney's Office filed a five-count amended information charging Petitioner with one count of murder, a violation of California Penal Code ("Penal Code") section 187(a) (count one), one count of penetration by a foreign object, a violation of Penal

Code section 289(a) (count two), one count of robbery in the first degree, a violation of Penal Code section 211 (count three), one count of willful cruelty to an elder, a violation of Penal Code section 368(b) (count four), and one count of residential burglary, a violation of Penal Code section 460 (count five). (Lodgment No.2, vol. 1 at 0014-17.) As to the murder count, the information alleged two special circumstances: the murder was committed during the commission and attempted commission of (1) robbery, and (2) a burglary, within the meaning of Penal Code sections 190.2(a)(17). (*Id.*) In addition, the information alleged that the penetration by a foreign object was committed during the course of a burglary, that Watkins personally inflicted great bodily injury on the victim, and personally used a deadly weapon, within the meaning of Penal Code sections 667.61(a)(c)(e), 12022(b)(1) and 12022.8. (*Id.*) Watkins was also alleged to have committed the robbery in an inhabited dwelling, personally used a deadly weapon during the commission of the robbery and burglary and committed the robbery and burglary against a person sixty-five years or older, within the meaning of Penal Code sections 212.5(a), 12022(b)(1) and 667.9(a). (*Id.*) Finally, the information alleged that Watkins had personally used a deadly weapon and inflicted great bodily injury to a person 70 years or older during the commission of willful cruelty to an elder, within the meaning of Penal Code sections 12022(b)(1) and 12022.7(c). (*Id.*) The District Attorney's Office elected to seek the death penalty against Watkins. (*Id.* at 0019.)

Following a jury trial, Watkins was convicted of first degree murder, first degree robbery, willful cruelty to an elder, and burglary. (Lodgment No. 2, vol. 3 at 0722-26.) The jury also found the special circumstances and the allegations true. (*Id.*) The jury acquitted Watkins of penetration by a foreign object. (*Id.* at 0723.) During the penalty phase, the jury recommended Watkins be sentenced to life without the possibility of parole. (Lodgment No. 2, vol. 4 at 804.) The judge accepted the jury's recommendation and Watkins was sentenced to life without the possibility of parole. (*Id.* at 0830-33.)

Watkins appealed his conviction to the California Court of Appeal for the Fourth Appellate District, Division One, which upheld his conviction and sentence in an unpublished opinion. (*See* Lodgment Nos. 6, 7.) Watkins then filed a Petition for Review in the California Supreme Court, which that court denied without citation of authority. (*See* Lodgment Nos. 8, 9.)

Watkins next filed a petition for writ of habeas corpus in the San Diego Superior Court, which was denied in an unpublished written opinion. (*See* Lodgment No. 10.) He filed a petition for writ of

habeas corpus in the California appellate court, which the court denied in an unpublished written opinion.  (*See* Lodgment No. 11.)  Finally, he filed a petition for writ of habeas corpus in the California Supreme Court, which the court denied without citation of authority.  (*See* Lodgment No. 12.)

Watkins filed the instant petition in this Court on January 29, 2007 (doc. no. 1).  Respondent filed an Answer and Memorandum of Points and Authorities in Support of the Answer on July 12, 2007 (doc. no. 22).  Watkins filed a Traverse on July 23, 2007 (doc. no. 21).

## IV.    DISCUSSION

### A.    Scope of Review

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in <u>violation of the Constitution or laws or treaties of the United States.</u>

28 U.S.C.A. § 2254(a) (West 2006) (emphasis added).  As amended, 28 U.S.C. § 2254(d) reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was <u>adjudicated on the merits</u> in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d)(1)-(2) (West 2006) (emphasis added).

"AEDPA establishes a 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Womack v. Del Papa*, 497 F. 3d 998, 1001 (9th Cir. 2007) (quoting *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002)).  To obtain federal

/ / /

/ / /

/ / /

1  habeas relief, Watkins must satisfy either § 2254(d)(1) or § 2254(d)(2).  *See Williams v. Taylor*, 529

2  U.S. 362, 403 (2000).  The Supreme Court interprets § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

7  *Williams*, 529 U.S. at 412-13; *see also Lockyer v. Andrade*, 538 U.S. 63, 73-74 (2003).

8  Where there is no reasoned decision from the state's highest court, the Court "looks through"

9  to the underlying appellate court decision.  *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991).  If the

10  dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must

11  conduct an independent review of the record to determine whether the state court's decision is contrary

12  to, or an unreasonable application of, clearly established Supreme Court law.  *See Delgado v. Lewis*, 223

13  F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Lockyer*, 538 U.S. at 75-76); *accord Himes*

14  *v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  However, a state court need not cite Supreme Court

15  precedent when resolving a habeas corpus claim.  *Early v. Packer*, 537 U.S. 3, 8 (2002).  "[S]o long as

16  neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]"

17  the state court decision will not be "contrary to" clearly established federal law.  *Id.*

18  **B.     Analysis**

19  Watkins alleges his federal constitutional rights were violated when: (1) the prosecutor

20  committed misconduct by presenting false DNA lab reports and perjured testimony by a criminalist

21  (claims one and three); (2) his trial counsel was ineffective for failing to challenge the prosecutor's

22  misconduct, failing to introduce evidence of an improper letter sent by a detective to the DNA lab and

23  failing to investigate and introduce evidence of unidentified blood on Watkins' clothing  (claims two,

24  four, five and six); (3) his appellate counsel was ineffective for failing to raise the instances of

25  ineffective assistance of trial counsel on appeal (claims two, four, five and six); (4) the prosecutor

26  improperly excluded African-American jurors in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986)

27  (claim seven); (5) the trial court improperly refused to instruct the jury on the defenses of voluntary

28  intoxication and involuntary manslaughter (claim eight); (6) the trial court incorrectly instructed the jury

on felony murder (claim nine); and (7) his statement to police was admitted in violation of the Fifth

Amendment (claims ten and eleven).  (Pet. at 6-28; Pet'rs Ex. A-E.)

Respondent asserts, with respect to claims one through nine, that the state courts' adjudication

of the claims was neither contrary to, nor an unreasonable application of, clearly established Supreme

Court law.  (Resp't Mem. at 8- 26.)  As to claims ten and eleven, Respondent states the claims are

unexhausted and asks the Court to "deny grounds 10 and 11 because they have no merit, under 28

U.S.C. § 2254(b), or in the alternative to dismiss the Petition as being unexhausted."  (Resp't Mem.

at 27.)

### 1.    *Prosecutorial Misconduct (Claims One and Three)*

Watkins alleges that the prosecutor committed misconduct in two ways.  First, he claims the

prosecutor presented perjured testimony and false laboratory reports with respect to blood stains on a

pair of boxer shorts belonging to Watkins.  Specifically, Watkins contends that criminalist David

Cornacchia testified at the preliminary hearing that he detected one small stain on the boxer shorts which

tested presumptively positive for blood, but at trial he testified that there were two stains on the boxer

shorts which tested positive for blood.  (Pet. at 6, 12-13.)  Second, Watkins claims the prosecutor

presented perjured testimony and false laboratory reports with respect to the results of two penile swabs

analyzed by Cornacchia.  He claims that Cornacchia testified at the preliminary hearing that he did not

perform a presumptive test for blood on the swabs, but later at trial testified that he did perform a

presumptive blood test which was negative.  (*Id.* at 8, 15.)  Respondent counters that there were no

inconsistencies between Cornacchia's testimony at the preliminary hearing and the trial, and thus, the

state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly

established Supreme Court law.  (Resp't Mem. at 9-14.)

Watkins raised these claims in a habeas corpus petition he filed in the California Supreme Court,

which that court denied without citation of authority.  (*See* Lodgment No. 12.)  Accordingly, this Court

must "look through" to the California appellate court's decision denying the claim. *See Ylst*, 501 U.S.

at 801-06.  That court wrote:

> Concerning violations of due process due to prosecutorial misconduct, Watkins
> contends the prosecutor committed misconduct by presenting false laboratory reports and
> Cornacchia's inconsistent testimony to the jury.  However, Watkins presents no facts,
> law or argument to support his claim that the prosecution presented false laboratory

reports.  Further, as discussed above, Watkins presents no evidence that Cornacchia

testified inconsistently.  He has failed to state a prima facie case for relief.  (*People v. Duvall*, *supra*, 9 Cal.4th 464, 475.)

(Lodgment No. 11 at 3-4.)

Clearly established Supreme Court law holds that "[t]he knowing use of perjured testimony by a prosecutor generally requires that the conviction be set aside." *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) (citing *United States v. Agurs*, 427 U.S. 97, 103 (1976).) "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. People of the State of Illinois*, 360 U.S. 264, 269 (1959).  However, the presentation of conflicting versions of events, without more, does not constitute knowing presentation of false evidence. *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002) (citing *United States v. Sherlock*, 962 F.2d 1349, 1364 (9th Cir. 1989)).

    1.    *Blood on the Boxer Shorts*

At the preliminary hearing, the prosecutor asked criminalist David Cornacchia about his examination and testing of Watkins's undershirt and a jacket found at the scene.  (Lodgment No. 3 at 144-50.)  On cross-examination, defense counsel asked about Cornacchia's examination and testing of boxer shorts Watkins was wearing when he was arrested.  (*Id.* at 155.)  Cornacchia testified that "there was a very small stain that presumptively tested positive for blood" on the boxers.  (*Id.* at 156.)  Because further testing would consume the sample, the prosecutor and defense counsel had not agreed at that time on how to test the stain.  (*Id.*)

At trial, Cornacchia again testified he found what he referred to as a "blood-like stain" on the front of the boxer shorts which tested presumptively positive for blood.  (Lodgment No. 1, vol. 4 at 1122.)  Sometime before trial, counsel had agreed to send the stain to an independent DNA lab, Cellmark, for further testing.  (*Id.* at 1123-25.)  Cornacchia also testified that before he sent the stain off to Cellmark, he noticed a second stain on the back of the boxer shorts which also presumptively tested positive for blood.  (*Id.* at 1125.)  According to Cornacchia, the second stain appeared to be a "soak-through" from the first stain on the front.  (*Id.* at 1126.)  There was no testimony about any testing on the second stain other than the presumptive blood test.

///

Watkins complains that Cornacchia perjured himself at trial because at the preliminary hearing he testified that he had found only one stain but at trial he testified he found two stains.  (Pet. at 6, 12-13.)  A review of the record, however, supports a conclusion that Cornacchia's testimony was consistent.  He testified at trial that he found the second stain on the boxers just before he sent the first stain to Cellmark.  (Lodgment No. 1, vol. 4 at 1125.)  Thus, it appears he had overlooked the second stain at the time he testified at the preliminary hearing.  This is not perjury.  *See Geston*, 299 F.3d at 1135 (holding that the presentation of conflicting versions of events, without more, does not constitute knowing presentation of false evidence.)

Watkins also appears to complain that Cornacchia testified at the preliminary hearing that the stain on the boxer shorts tested presumptively positive for blood but at trial he testified the stain tested presumptively negative for blood.  (Pet. at 6, 12-13.)  Watkins refers to this exchange as support for his argument:

> Q. [By defense counsel] On the boxer shorts, my understanding that there were two areas on the front of the them that you checked; is that correct?
>
> A. Actually, there was just the one area that had the stain and the other area was an unstained control area.
>
> Q. Okay.  That uncontrolled stain area was negative for blood; is that correct?
>
> A. Yes, it was.

(Lodgment No. 1, vol. 5 at 1179.)

This exchange does not support Watkins's claim.  It appears that defense counsel merely misspoke and referred to the "uncontrolled stain area" instead of the "unstained control area" and that Cornacchia did not catch the error when he responded "yes."  This conclusion is supported by the fact that two pages later, Cornacchia was again asked about the unstained control area, and answered consistently with his preliminary hearing testimony:

> Q. I believe 48A – its on page 10, sir, of that report.
>
> A. Yes, 48A-2 was my unstained control area.
>
> Q. And the unstained control area, there was – you were not able to get a genetic profile from that; is that correct?

///

1

2

A.  That is correct.

(*Id.* at 1181.)

3

4

5

Thus, Watkins has provided no evidence of perjured testimony or fraudulent laboratory tests. Accordingly, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.

6

7

2.      *Blood on the Penile Swabs*

8

9

10

11

12

13

Cornacchia also testified about his examination and testing of penile swabs taken from Watkins. At the February 15, 2002, preliminary hearing, Cornacchia testified that he visually examined the swabs, conducted a DNA analysis and tested for the presence of sperm cells.  (Lodgment No. 3 at 146, 150-51.) He also stated he did not perform a presumptive test for blood on the swabs.  (*Id.* at 153.)  At trial, Cornacchia testified on direct examination that he did perform a presumptive test for blood on the penile swabs, which was negative.  (Lodgment No. 1, vol. 5 at 1158-59.)  On cross-examination at trial, defense counsel questioned Cornacchia on the negative result as follows:

14

15

Q. [...] I believe on February 27 you authored a report regarding blood testing on item 47 [the penile swabs].  Do you remember that, sir?

16

A.  Yes, I do.

17

18

Q.  An Mr. Greenwood – my understanding, Mr. Greenwood specifically asked you to test the blood on item 47; is that correct, sir?

19

A.  That is correct.

20

Q.  And you did a presumptive test for blood; is that correct?

21

A.  Yes, it is.

22

. . . .

23

Q.  And you got a negative result, correct?

24

A.  That is correct.

(*Id.* at 1195.)

25

26

27

28

From this testimony, it appears that at the time of the February 15, 2002, preliminary hearing, Cornacchia had not tested the swabs for blood.  Following the hearing, the prosecutor asked Cornacchia to test the swabs, which he did with negative results, on or about February 27, 2002.  He then testified

/ / /

1    about the negative test results at trial on June 9, 2003.  Thus, there was no false testimony presented.

2    *See Geston*, 299 F.3d at 1135.

3    Watkins claims that he was prejudiced by Cornacchia's testimony because "[t]he jury was

4    allowed to retire with the inaccurate impression that the penile swabs contained blood and that

5    Cornacchia's presumptive chemical test was not sensitive enough to detect it." (Pet. at 8, 15.) However,

6    it was the defense who presented evidence that the swabs contained blood through the testimony of their

7    own expert witness, Dr. Alan Keel.  He testified he tested the penile swab for blood and got a positive

8    result with a more sensitive test.  (Lodgment No. 1, vol. 10 at 1943-48.)

9    For all the foregoing reasons, the state court's denial of this claim was neither contrary to, nor

10   an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.

11   He is not entitled to relief as to this claim.

12       2.   *Ineffective Assistance of Trial Counsel (Claims Two, Four, Five and Six)*

13   Watkins alleges that his trial attorney was ineffective for failing to challenge Cornacchia's

14   testimony and the test results on the boxer shorts and the penile swabs.  (Pet. at 7, 9, 14, 16.)  He also

15   alleges that his trial attorney was ineffective for failing to investigate an allegedly improper letter sent

16   by Detective James Tomsovic to the DNA lab, failing to cross-examine Tomsovic regarding the letter

17   and for failing to investigate and present evidence regarding unidentified blood found on Watkins's

18   clothing.  (Pet. at 17-20.)  Respondent argues the state court's denial of these claims was neither

19   contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Resp't Mem.

20   at 9-18.)

21   Watkins raised these claims in a habeas corpus petition he filed in the California Supreme Court,

22   which denied the claims without citation of authority.  (Lodgment No. 12.)  Accordingly, this Court

23   must "look through" to the California appellate court's decision denying this claim as the basis for its

24   analysis.  *Ylst*, 501 U.S. at 801-06.  That court stated:

25       Here, Watkins asserts trial counsel (1) did not impeach DNA analyst David
     Cornacchia's testimony concerning the number of blood stains on Watkins's boxer
26   shorts; (2) did not cross-examine Cornacchia about the test results from two penile swabs
     taken from Watkins; (3) did not present evidence at trial that blood from an unidentified
     female was found on Watkins's shoes; and (4) did not cross-examine Detective
27   Tomsovic concerning a biased letter he wrote to the director of the crime lab or introduce
     the letter at trial.  In this case, Watkins does not include any supporting evidence with
28   his petition and, consequently, has not shown trial counsel's performance was deficient
     or prejudicial.

First, concerning counsel's alleged failure to point out inconsistencies with Cornacchia's testimony, Watkins has not established there are any inconsistencies. At the preliminary hearing Cornacchia testified he identified a stain on the front of Watkins's boxer shorts that tested positive for blood. At trial Cornacchia again testified he noticed a stain on the front of Watkins's boxer shorts and the stain tested positive for blood. Cornacchia did note there was a second stain on the back of the shorts, but that stain originated when the first stain soaked through the shorts. Because there were no inconsistencies in Cornacchia's testimony, counsel's performance was not deficient.

Second, Watkins has not established any inconsistencies with Cornacchia's testimony regarding blood test on the penile swab samples because he presents no facts to support this argument. Further, the swabs tested negative for blood. Thus, Watkins has not shown how he was prejudiced by counsel's alleged failure to cross-examine Cornacchia.

Next, Watkins has not shown how he was prejudiced by counsel's failure to introduce evidence that blood from an unidentified female was found on his shoes. The premise of Watkins's argument is that this blood shows another person was present at the crime scene who could have committed the crime. However, introducing the evidence could have resulted in prejudice to Watkins because the jury could believe the blood was evidence of another crime committed by Watkins. Introducing the evidence could have been more prejudicial to Watkins's case.

Finally, Watkins has not shown how he was prejudiced by counsel's failure to introduce a letter from Detective Tomsovic to the director of the crime lab. The letter set forth a list of evidence Tomsovic was looking for, subject to verification by the crime lab. Had counsel introduced the letter as evidence, Watkins has not shown the outcome of this trial would have been different.

(Lodgment No. 11 at 2-3.)

To establish ineffective assistance of counsel, Watkins must first show that his trial counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "This requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Judicial scrutiny of counsel's performance must be "highly deferential." *Id.* at 689. Second, he must show counsel's deficient performance prejudiced the defense. *Id.* at 687. This requires showing that counsel's errors were so serious they deprived Watkins "of a fair trial, a trial whose result is reliable." *Id.* To satisfy the prejudice prong, Watkins need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error. *Id.* at 694. The prejudice inquiry is to be considered in light of the strength of the prosecution's case. *Luna v. Cambra*, 306 F.3d 954, 966 (9th Cir.), *amended*, 311 F.3d 928 (9th Cir. 2002).

/ / /

-12-

a.     *Failure to Cross-Examine Cornacchia Regarding the Boxer Shorts and the Penile Swabs*

As discussed above, there were no discrepancies between Cornacchia's testimony about the boxer shorts and penile swabs at the preliminary hearing and his testimony about those items at trial. As to the boxer shorts, it appears from the record that Cornacchia noticed the soak-through stain on the back of the boxers just before he sent the boxers to Cellmark for DNA analysis and that the portion of the boxers which tested negative for blood was the unstained control area.  Thus, counsel's failure to question Cornacchia about this alleged discrepancy in testimony at the preliminary hearing was not ineffective because there was no inconsistency to exploit.  *See Strickland*, 466 U.S. at 687-89. Moreover, Watkins has not established he was prejudiced by any failure by counsel to question Cornacchia about the second stain he found on the back of the boxers.  Cornacchia's testimony had already established that the victim's blood was present on one stain on the front of the boxers, a jacket which other witnesses identified as belonging to Watkins was found at the murder scene, and Watkins's fingerprints and DNA were found inside the victim's house.  (Lodgment No. 1, vol. 4 at 1057-84, 1101-27; vol. 5 at 1155-1208.)  The presence of a second stain did little to add to the prosecution's case.

With regard to the penile swabs, the record indicates that Cornacchia had not tested the swabs for blood before he testified at the preliminary hearing, the prosecutor subsequently asked him to test the swabs for blood and that by the time he testified at trial he had tested the swabs for blood and had gotten a negative result.  Counsel's failure to question Cornacchia about the differences between his testimony at the preliminary hearing and at trial, therefore, was not unreasonable because it does not cast doubt on Watkins's guilt.  In addition, Watkins does not establish how the result of the proceeding would have been different had counsel pointed out that Cornacchia had not performed the presumptive blood test before his testimony at the preliminary hearing but had done so by the time of trial.  Rather, counsel chose to try to discredit Cornacchia by questioning his failure to detect blood on the swabs in light of the fact that the defense expert did detect it.  This was a strategic decision, however, which, viewed through the "highly deferential" lens required by *Strickland*, was reasonable.  *Id.* at 689. Accordingly, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.

/ / /

-13-

b.    *Failure to Question Detective Tomsovic Regarding His Letter to the Crime Lab*

Watkins claims counsel should have questioned Detective Tomsovic about a letter he sent to the crime lab in which he said the following:

> [W]e need to find traces of Brown (i.e., blood, etc.) [on Watkins'] clothing, or traces of [Watkins'] (i.e., semen, hair, skin, etc.) on or in Brown as a first priority . . . . Secondly, Watkins' prints in Brown's house or on her property would be damning, but not all inclusive . . . .

(Lodgment No. 1, vol. 1 at 6-7.)

Watkins claims that counsel should have questioned Tomsovic about the bias displayed by the letter.  Had counsel done so, Watkins contends, this information, coupled with the alleged perjury and false laboratory reports presented by Cornacchia, would have led the jury to believe that the crime lab had manufactured the scientific evidence used to convict Watkins.  (Pet. at 17-18.)

Counsel filed a pretrial motion pursuant to *Pitchess v. Superior Court*, 11 Cal. 3d 351 (1974)[3] asking for any information from Detective Tomsovic's personnel file about abuse, harassment, threats, false testimony, arrests or statements, dishonesty, misconduct involving moral turpitude, manufacturing or planting of evidence or dishonest police conduct.  (Lodgment No. 2, vol. 1 at 0117-18.)  The motion referred to Tomsovic's letter as support.  At the hearing on the motion, the trial judge concluded that the defense had not made a sufficiently specific showing as to any bias on the part of Tomsovic and denied the *Pitchess* motion.  (Lodgment No. 1, vol. 1 at 6-15.)  The prosecutor later filed a motion asking the court to admit the entire letter if the defense chose to introduce the letter.  (Lodgment No. 2, vol. 2 at 430-33.)  During in limine motions, defense counsel agreed to provide notice to the prosecutor if they intended to introduce the letter; the letter was never introduced.  (Lodgment No. 1, vol. 2 at 343.)

Watkins has not provided this Court with sufficient evidence to establish that he was prejudiced by counsel's failure to introduce the letter into evidence or question Tomsovic about it.  The prosecution introduced significant scientific evidence tying Watkins to the crime – Watkins's fingerprints in Brown's house, Watkins's jacket on the floor of Brown's house and Brown's blood on Watkins's

---

[3]  In *Pitchess*, the California Supreme Court held that a defendant may move to discover information contained in law enforcement officers' personnel files which is relevant to issues in the current case, such as prior incidents of falsifying information or coercing witnesses.  The judge then conducts an *in camera* review of the files to determine if any discoverable information is contained therein.  Any relevant evidence is then turned over to the defendant.  *See Pitchess*, 11 Cal. 3d 531; *see also* Cal. Evid. Code § 1043-1046.

undershirt and boxer shorts.  It is highly unlikely that the alleged bias exposed by the letter would have led the jury to a different conclusion in the face of such strong evidence to the contrary.  The jury would have had to believe that all of the scientific evidence had been falsified in response to Tomsovic's letter.  There is simply no evidence to support such a scenario.

Accordingly, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.  Watkins is not entitled to relief as to this claim.

c.      *Failure to Investigate and Present Evidence of Unidentified Blood Found on Watkins's Shoes*

Finally, Watkins alleges his trial counsel was ineffective for failing to investigate and present evidence regarding blood found on Watkins's shoes which could not be identified as belonging to either Watkins or Brown.  (Pet. at 19-20.)  He claims that had such evidence been presented, the jury could have concluded that another person was present with Watkins at the murder scene and may have been involved in the murder.  (*Id.*)

Before trial, DNA testing had revealed that a blood spot on Watkins's shoe matched the DNA profile of the victim but that an unidentified female's DNA was also present.  Blood on Watkins's sweatshirt also contained the blood of an unidentified female.  (Lodgment No. 1, vol. 2 at 333-34.)  Defense counsel successfully moved to exclude any reference to the presence of blood from an unidentified female from the evidence to be presented at trial.  (*Id.*)  DNA expert Brian Wraxall testified at trial that he found blood on Watkins's shoes which matched the victim's DNA profile.  (Lodgment No. 1, vol. 7 at 1574-85.)

Watkins has not met the first prong of his burden under *Strickland*.  466 U.S. at 687-89.  It was a perfectly reasonable strategic decision for counsel to move to exclude evidence that Watkins had blood from an unidentified female on his clothes.  As the state court correctly pointed out, this could well have led the jury to believe that Watkins had committed additional crimes against additional victims.  Moreover, Watkins has not presented any evidence that, had the evidence been admitted, the result of his trial would have been more favorable.  *Id.* at 694.  The presence of another person at the scene of the murder would have done nothing to lessen Watkins's culpability for the murder.  First, there was no

1

2   evidence that a third person inflicted the wounds on Brown.  Secondly, as Respondent points out,

3   Watkins could still have been convicted of first degree special circumstance felony murder under an

4   aiding and abetting theory because California law holds persons who aid and abet a crime liable for that

5   crime. *See* Cal. Penal Code § 31; *see also People v. Prettyman*, 14 Cal. 4th 248, 259 (1996) (stating that

6   "an aider and abettor is a person who, 'acting with (1) knowledge of the unlawful purpose of the

7   perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of

8   the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the

9   crime . . . .") (citing *People v. Beeman*, 35 Cal. 3d 547, 561 (1984)).

10          For the foregoing reasons, the state court's denial of this claim was neither contrary to, nor an

11   unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.

12          3.      *Ineffective Assistance of Appellate Counsel (Claims Two, Four, Five and Six)*

13          Watkins alleges his appellate counsel was ineffective for the same reasons he claims his trial

14   counsel was ineffective – failing to challenge Cornacchia's testimony and the test results on the boxer

15   shorts and the penile swabs, failing to investigate an allegedly improper letter sent by Detective James

16   Tomsovic to the DNA lab, failing to cross-examine Tomsovic regarding the letter and for failing to

17   investigate and present evidence regarding unidentified blood found on Watkins's shoes.  (Pet. at 7, 9,

18   14, 16, 17-20.)  Respondent again counters that the state court's denial of these claims was neither

19   contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Answer at 9-

20   15.)[4]

21          Watkins raised these claims in the habeas corpus petition he filed in the California Supreme

22   Court, which denied them without citation of authority.  (*See* Lodgment No. 12.)  Thus, this Court must

23   "look through" to the state appellate court's denial of this claim as the basis for its analysis.  *Ylst*, 501

24   U.S. at 801-06.  That court did not address the ineffective assistance of appellate counsel claims, and

25   therefore this Court must conduct an independent review of the record to determine whether the state

26   court's denial of the claims was contrary to, or an unreasonable application of, clearly established

27

28
_____
        [4] Although Respondent appears to address the ineffective assistance of counsel claims solely with respect
to trial counsel, the Court will assume Respondent's intent is to apply those arguments to appellate counsel as
well.

07cv0196

1  Supreme Court law.  *Himes*, 336 F.3d at 853.

2      "The proper standard for evaluating [a] claim that appellate counsel was ineffective . . . is that

3  enunciated in *Strickland*."  *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Smith v. Murray*, 477 U.S.

4  527, 535-36 (1986)).  Watkins must first show that his appellate counsel's performance fell below an

5  objective standard of reasonableness.  *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  He must

6  then establish he was prejudiced by counsel's errors.  *Id.* at 694.  To establish prejudice, Watkins must

7  show a reasonable probability that he would have prevailed on appeal absent counsel's errors.  *Smith*,

8  528 U.S. at 285 (citing *Strickland*, 466 U.S. at 694).  "The performance component need not be

9  addressed first '[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient

10  prejudice, which we expect will often be so, that course should be followed."  *Id.*, n. 144 (citing

11  *Strickland*, 466 U.S. at 697).

12      Watkins has not met either prong of *Smith*.  As discussed above, none of the errors Watkins

13  attributes to his trial counsel were either objectively unreasonable or caused him prejudice.  Accordingly

14  he has not shown that his appellate counsel was ineffective for failing to raise these issues on appeal,

15  or that the state court erred in denying this claim.  He is not entitled to relief.  *Williams*, 529 U.S. at 412-

16  13.

17          4.      *Exclusion of African American Jurors (Claim Seven)*

18      Watkins argues that his federal constitutional rights were violated when the prosecutor excluded

19  African-Americans from his jury through the use of peremptory challenges in violation of *Batson v.*

20  *Kentucky*, 476 U.S. 79 (1986).  (Pet'rs Mem. at 19-25.)  The Equal Protection Clause of the Fourteenth

21  Amendment to the United States Constitution prevents a prosecutor from systematically eliminating

22  potential jurors on the basis of racial identity.  *See Batson*, 476 U.S. at 79.  Respondent counters that the

23  state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly

24  established Supreme Court law.  (Answer at 18-20.)

25      Watkins raised this claim in a habeas corpus petition he filed in the California Supreme Court.

26  (*See* Lodgment Nos. 10, 11,12.)  Because that court denied the petition without citation of authority, the

27  appellate court's denial of this claim is the last reasoned state court opinion.  *See Ylst*, 501 U.S. at 801-

28  06.  That court concluded that Watkins had not "present[ed] facts showing the prosecution engaged in

discriminatory conduct in the jury-selection process."  (Lodgment No. 11 at 4.)  The court also noted

1    that

2    / / /

3

4    "one juror was African-American . . .[and] Watkins has not made a prima facie showing of racial

5    discrimination." (*Id.*)

6         In *Purkett v. Elem*, 514 U.S. 765 (1995), the United States Supreme Court outlined the steps a

7    court must follow in conducting a *Batson* analysis:

8             Under our *Batson* jurisprudence, once the opponent of a peremptory challenge
             has made out a prima facie case of racial discrimination (step one), the burden of
9             production shifts to the proponent of the strike to come forward with a race-neutral
             explanation (step two). If a race-neutral explanation is tendered, the trial court must then
10            decide (step three) whether the opponent of the strike has proved purposeful racial
             discrimination. *Hernandez v. New York*, 500 U.S. 352, 358-359, 111 S.Ct. 1859,
11            1865066, 114 L.Ed.2d 395 (1991) (plurality opinion); *id.*, at 375, 111 S.Ct. at 1874
             (O'CONNOR, J., concurring in judgment); *Batson, supra*, at 96-98, 106 S.Ct., at 1722-
12            1723.

13   *Purkett*, 514 U.S. at 767-68; *see also Mitleider v. Hall*, 391 F.3d 1039, 1047 (9th Cir. 2004).

14        To establish a prima facie case, a defendant must show: "(1) the prospective juror is a member

15   of a 'cognizable racial group.' (2) the prosecutor used a peremptory challenge to remove the juror, and

16   (3) the totality of the circumstances raises an inference that the strike was motivated by race." *Boyd v.*

17   *Newland*, 393 F.3d 1008, 1012 (9th Cir. 2004) (citing *Batson*, 476 U.S. at 96). If a defendant does not

18   establish a prima facie case, the defendant's challenge fails; the prosecutor is not required to provide

19   a "race neutral" explanation for the strike. *Id.* A state court's determination as to whether a prima facie

20   case has been made is a factual determination entitled to a presumption of correctness. *Tolbert v. Page*,

21   182 F.3d 677, 685 (9th Cir. 1999).[5]

22

23        [5] In *Wade v. Terhune*, 202 F.3d 1190 (9th Cir. 2000), the Ninth Circuit held that California's "strong
24   likelihood" test for a presenting a prima facie case under *Batson*, announced in *People v. Bernard*, 27 Cal. App.
     4th 458, 490 (1994) was "impermissibly stringent in comparison to the more generous *Batson* 'inference' test."
25   *See Wade*, 202 F.3d at 1197. Subsequently, the Ninth Circuit held that California decisions employing the "strong
     likelihood" test to determine whether a prima facie case had been made under *Batson* required de novo review.
26   *See Paulino v. Castro*, 371 F.3d 1083, 1090 (9th Cir. 2004). In 2000, the California Supreme Court held in
     *People v. Box*, 23 Cal. 4th 1153 (2000) that the "strong likelihood" test of *Wheeler* is the same as *Batson's*
27   "inference" test. *See Box*, 23 Cal. 4th at 1188, n.7. In response, the Ninth Circuit acknowledged that because
     California had clarified the legal standard it was imposing in *Batson* cases, de novo review was only appropriate
28   in pre-*Box* cases. *Paulino*, 371 F.3d at 1090 n. 5; *cf. Cooperwood v. Cambra*, 245 F.3d 1042, 1047 (9th Cir.
     2001) *Box* was issued August 17, 2000; the California Court of Appeal rejected Watkins's *Batson* claim in 2005.
     (*See* Lodgment No. 7.)

When the prosecutor excused the only two African-American prospective jurors, Mr. Cambridge and Mr. Henderson, who were present at the time, defense counsel made a *Batson* motion, stating that "[t]hey are members of a recognizable, cognizable racial group, they're African-Americans [and] [t]here is a reasonable inference that they've been excluded because they're African-American males . . . ." (Lodgment No. 4, vol. 4 at 907.) The trial judge stated that he wanted to review the excused jurors' questionnaires before he ruled on the challenge. (*Id.*) The prosecutor responded that he wanted to state his reasons for excluding Cambridge and Henderson on the record in order to avoid any perception that he had conjured up reasons during the time the judge was reviewing the questionnaires. (*Id.* at 907-08.) The prosecutor said that he excused Cambridge because he was unable to "articulate anything regarding opinions" and that he would not have chosen Cambridge to serve on the jury under any circumstances. (*Id.* at 908.) With regard to Henderson, the prosecutor noted that he was "focusing on issues of alcohol and drugs and how that might play a part in whether a person could form an intent." (*Id.*) This caused him to question whether Henderson would be a juror he would want to decide the case. (*Id.*) The trial judge reiterated his desire to review the questionnaires submitted by Cambridge and Henderson before ruling. (*Id.* at 909.)

The trial judge ruled on the *Batson* challenge two days later at the beginning of trial. Referring to the questionnaires filled out by prospective jurors, the trial court gave its reasons as follows:

> THE COURT: [referring to prospective juror Henderson] I note that on his questionnaire, it was question 51, he said he didn't want to be a juror on this case. He wrote in , "By choice, I wouldn't want to be involved." He also said that – let me see, what was it? On his attitude toward the death penalty, he said, "I'm not for killing anybody. It all matters on the degree of the crime." I don't know that we really probed that very well.
>
> But I didn't feel that there was a – oh, he said, if he wasn't mistaken, he read about this in the union tribune. But I think we did probe that area with him.
>
> Then I think as far as jury service, he indicated, "I'm not for it, being randomly picked. There's people who would choose to do it."
>
> So I didn't feel that there was a prima facie case.
>
> I was really more concerned with the other gentleman who was African-American, [Cambridge], not (name deleted). I wasn't concerned about the challenge of (name deleted) as I was the other one. But I think you indicated that, and I haven't reviewed his questionnaire, that he basically didn't say anything on his questionnaire.

(Lodgment No. 1, vol. 3 at 557-58.)

The Court has thoroughly reviewed the transcript of the voir dire proceedings.  It is clear that Watkins satisfied the first two elements of a prima facie case.  The challenged jurors were members of a "cognizable racial group" and the  prosecutor used peremptory challenges to remove them.  *See Boyd*, 393 F.3d at 1012.  The third element, however, whether the totality of the circumstances raise an inference that the strike was motivated by race, is not as clear.  When questioned on voir dire, Cambridge was unfocused and not very forthcoming about his views.  (*See* Lodgment No. 4, vol. 1 at 242-51.) He also appeared to be confused about the questions being asked of him.  (*Id.*) The prosecutor could have decided that he was unable to sufficiently gauge Cambridge's position on the death penalty and his ability to fairly and accurately assess the prosecution's case.  The second African-American juror, Henderson, expressed a desire not to serve on the jury and a frustration for the way prospective jurors are summoned.  (Lodgment No. 4, vol. 4 at 687-88.)  He also expressed some negative feelings about law enforcement personnel due to an "unfortunate experience," and had personal experience with the effects drugs had on people close to him.  (*Id.* at 693-94.)  The prosecutor could have determined that a juror with this kind of background would be more favorable to the defense.

The evidence supporting the state courts' decision is not overwhelming.  Given the deference this Court must give to the factual findings of the state court, however, this Court cannot conclude that the state courts' determination that Watkins did not present a prima facie case was unreasonable.  Accordingly, Watkins is not entitled to relief as to this claim.  *Williams*, 529 U.S. at 412-13.

5. *Instructional Error (Claims Eight and Nine)*

Watkins claims the trial court improperly refused to instruct the jury on the defense of voluntary intoxication and the crime of involuntary manslaughter.  (Pet. at 23-25; Pet'rs Ex. A at 1-34.)  He also claims the instructions given to the jury on the robbery/burglary felony-murder special circumstance allegations were deficient because they did not require the jury to find that that the murder was committed for the express purpose of facilitating the robbery/burglary.  (*Id.*)  Respondent contends the state court's adjudication of these claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Resp's Mem. at 2-26.)

"Instructional error will not support a petition for federal writ of habeas relief unless it is shown 'not merely that the instruction is undesirable, erroneous, or even "universally condemned,"'[citation

07cv0196

1   omitted], but that 'the ailing instruction by itself so infected the entire trial that the resulting conviction

2   violates due process.' [citation omitted]." *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001)

3   (quoting *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)); *see also Henderson v. Kibbe*, 431 U.S. 145, 154

4

5   (1977).  Moreover, the allegedly erroneous jury instruction cannot be judged in isolation.  *Estelle v.*

6   *McGuire*, 502 U.S. 62, 72 (1991).  Rather, it must be considered in the context of the entire trial record

7   and the instructions as a whole.  *Id.; see also Gilmore v. Taylor*, 508 U.S. 333, 343-44 (1993) (finding

8   that the right to present a complete defense does not entitle a defendant to a particular set of jury

9   instructions).

10          In the context of a trial court's failure to give an instruction on a theory of the defense, the Ninth

11   Circuit has noted that "[u]nder the Due Process Clause of the Fourteenth Amendment, criminal

12   prosecutions must comport with prevailing notions of fundamental fairness . . . [which] require that

13   criminal defendants be afforded a meaningful opportunity to present a complete defense." *Bradley v.*

14   *Duncan*, 315 F.3d 1091, 1098-99 (9th Cir. 2002) (citing *Mathews v. United States*, 485 U.S. 58, 63

15   (1988) and *California v. Trombetta*, 467 U.S. 479, 485 (1984)).  Thus, a "'[f]ailure to instruct on the

16   defense theory of the case is reversible error if the theory is legally sound and evidence in the case

17   makes it applicable.'" *Clark v. Brown*, 450 F.3d 898, 904-05 (9th Cir. 2006) (quoting *Beardslee v.*

18   *Woodford*, 358 F.3d 560, 577 (9th Cir. 2004)); *Solis v. Garcia,* 219 F.3d 922, 929 (9th Cir. 2000);

19   *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984) (quoting *James v. Reese*, 546 F.2d 325, 327 (9th

20   Cir. 1976)).  However, the Supreme Court has recognized "that due process requires that a lesser

21   included offense instruction be given *only* when the evidence warrants such an instruction." *Hopper*

22   *v. Evans*, 456 U.S. 605, 611 (1982) (emphasis in original).[6]

23          a.    *Voluntary Intoxication and Involuntary Manslaughter (Claim Eight)*

24          Watkins raised this claim on direct appeal.  Thus, because the state supreme court denied the

25   claim on direct appeal without citation of authority, the last reasoned state court decision to which this

26   Court must look is the state appellate court's opinion denying the claim.  *See Ylst*, 501 U.S. at 801-06.

27

28          [6] California law is consistent with *Hopper*.  In California, a trial judge must instruct the jury on lesser included offenses if they are supported by substantial evidence, including defenses that are not inconsistent with defendant's theory of the case. *People v. Breverman*, 19 Cal. 4th 142, 148-49 (1998); *People v. Montoya*, 7 Cal. 4th 1027, 1047 (1994).

1    That court wrote:

2          Watkins contends that the trial court erred in denying his request to instruct the
     jury on voluntary intoxication and involuntary manslaughter because the testimony of
3    various witnesses that he was highly addicted to drugs and alcohol and defense expert
     testimony as to the amount of drugs and alcohol in his system after his arrest the next day
4    constituted circumstantial evidence that he was under the influence of alcohol and/or
     drugs at the time the killing occurred.  He also contends that the jury could have
5    reasonably concluded that he was under the influence at the time of the offense because,
     in light of the evidence that he was normally nonviolent and respectful, there was no
6    other explanation for why he acted in such a violent manner toward an elderly friend
     who had been kind to him in the past.  We reject Watkins's arguments and conclude that
7    the court correctly found that the evidence was insufficient to show that Watkins was
     intoxicated, or his level of intoxication, *at the time of the offense.*

8
          Although the evidence showed that Watkins was under the influence of alcohol
9    and drugs at the time of his arrest, the evidence does not indicate that he was in that
     condition when he killed Brown.  In fact, witnesses who saw Watkins on the afternoon
10   and evening of the murder testified that he did not appear to be intoxicated or under the
     influence of drugs.  Watkins attempts to explain away this testimony by citing to the
11   testimony of his former lover that he often did not exhibit outward signs of being under
     the influence even when he was in such a condition.  However, this testimony does not
12   permit an inference that Watkins was in fact under the influence at the time he
     committed the offense.

13
          Watkins relies heavily on Dr. Alan Abrams' testimony that the significant level
14   of cocaine in his system five hours after his arrest showed that he had used the drug
     within the preceding 24 hours "or more."  However, Dr. Abrams admitted that, without
15   knowing when Watkins used the alcohol and drugs, there was no way of knowing what
     Watkins's condition was at any particular time prior to his arrest.  Thus, the evidence of
16   Watkins's condition 24 hours after the killing is not sufficient to establish that he was
     under the influence at the time of the offense.  Further, Dr. Abrams's testimony is
17   insufficient to establish that Watkins was so intoxicated that he could not form the
     requisite intent to support the charges against him.  (*People v. Williams*, *supra*, 16
18   Cal.4th at pp.677-678.)

19         Watkins suggests that the depravity of the crime itself is evidence that he was
     under the influence.  Unfortunately, many horrific crimes are committed by people who
20   are not under the influence of drugs or alcohol and thus the nature of the crime itself is
     not sufficient to permit an inference that Watkins was under the influence of drugs or
21   alcohol at the time of the killing, even in the face of evidence that he was generally a
     non-violent person.  Although Watkins might not have been under the influence at the
22   time he killed Brown, such a conclusion cannot be based on mere speculation, but must
     be supported by substantial evidence.

23
          Finally, Watkins argues that the court's refusal to give the intoxication-related
24   instructions violated his constitutional right to present a defense in this case.  However,
     in the absence of sufficient evidence to support the giving of such instructions, the court
25   did not err, nor did it violate Watkins's constitutional rights, by denying Watkins's
     request to instruct the jury regarding voluntary intoxication and involuntary
26   manslaughter.  (See *Hopper v. Evans* (1982) 456 U.S. 605, 611; *People v. Flannel*
     (1979)  25 Cal.3d 668, 684-685, fn. 12, superseded by statute on another ground as
27   stated in *In re Christian S.* (1994) 7 Cal.4th 768, 777.)

28
     (Lodgment No. 7 at 12-14) (emphasis added.)

California Penal Code section 22 restricts the parameters of the defense of voluntary intoxication as follows:

> (a) No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition.  Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act.

> (b) Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought.

> (c) Voluntary intoxication includes the voluntary ingestion, injection or taking by any other means of any intoxicating liquor, drug, or other substance.

(Cal. Penal Code § 22) (West Supp. 2007.)

California Jury Instructions, Criminal ("CALJIC") instruct the jury on voluntary intoxication as it relates to intent as follows, in pertinent part:

> In the crime[s] of _____ of which the defendant is accused in Count[s] ___ . . . a necessary element is the existence in the mind of the defendant of the [specific intent to _____ ]  [mental state[s] _____ ].

> If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider that fact in deciding whether defendant had the required [specific intent] [mental state].

> If from all the evidence you have a reasonable doubt whether the defendant formed that [specific intent] [mental state[s]], you must find that [he] [she] did not have such [specific intent]  [mental state[s]].

>                                       . . . .

> If the evidence shows that a defendant was intoxicated at the time of the alleged crime, you should consider that fact in deciding whether or not [that] defendant had the required [specific intent] [or] [mental state].

> If from all the evidence you have a reasonable doubt whether a defendant had the required [specific intent] [or] [mental state], you must find that defendant did not have that [specific intent] [or] [mental state].

(CALJIC Nos. 4.21, 4.21.1.)

California law, consistent with federal law, requires a trial court to "instruct the jury on every theory of the case, 'but only to the extent each is supported by substantial evidence.'" *People v. Greenberger*, 58 Cal. App. 4th 298, 378 (1997) (quoting *People v. Flannel*, 25 Cal. 3d 668 (1979), internal quotation marks omitted.)  In Watkins's case, as both the trial court and appellate court correctly

found, there was insufficient evidence to warrant a voluntary intoxication instruction. Evidence was presented showing Watkins used drugs and alcohol frequently and that he was intoxicated at the time of his interview with police. (Lodgment No. 1, vol. 4 at 1000-02; vol. 5 at 1272-74, 1299-1300; vol. 9 at 1801-02; Lodgment No. 5 at 0002.) There was insufficient evidence presented, however, to show that Watkins was intoxicated at the time of the murder. Defense expert Alan Abrams testified that although cocaine metabolite and PCP were found in Watkins's urine sample taken at the time of his interrogation, he could only say that Watkins "used a fair amount of cocaine within 24 hours, 48 hours, 72 hours" but he could not extrapolate from the urine test results how intoxicated Watkins was at the time Brown was thought to have been murdered. (Lodgment No. 1, vol. 10 at 2029-32, 2049-50.) In addition, Sylvia Castro and Latesha Johnson, who saw Watkins the night of murder when he tried to sell them some jewelry, said Watkins did not appear to be under the influence of alcohol or drugs . (Lodgment No. 1, vol. 3 at 730-31, 738-39, 743; vol. 4 at 964-67.) Sarita Santana, the mother of Watkins's child, testified that Watkins came to her sometime on Saturday afternoon trying to give her some jewelry, in exchange for some crack cocaine. (Lodgment No. 1, vol. 5 at 1291-92.)

Further, the evidence presented did not support an involuntary manslaughter instruction. Involuntary manslaughter is "the unlawful killing of a human being without malice . . . [during] the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (Cal. Penal Code section 192(b).) The California Supreme Court has explained the interplay between voluntary intoxication and involuntary manslaughter as follows:

> [I]f, in a murder case, evidence of mental illness or intoxication raises a reasonable doubt the defendant premeditated or deliberated, but establishes he did harbor malice aforethought, then he is guilty of second degree murder; if such evidence negates malice aforethought, the only supportable verdict is involuntary manslaughter or acquittal. (*People v. Saille* (1991) 54 Cal.3d 1103, 1117, 2 Cal.Rptr.2d 364, 820 P.2d 588.)

*People v. Halvorsen*, 42 Cal. 4th 379, 419 (2007).

Watkins was accused of committing the murder during a burglary or robbery, both felonies. He was not accused of committing "a lawful act which might produce death in an unlawful manner or without due caution and circumspection." (Cal. Penal Code § 192(b).) In addition, as discussed above,

07cv0196

1   there was insufficient evidence of voluntary intoxication.[7]  Accordingly there was insufficient evidence

2   to support an involuntary manslaughter instruction.

3        For the foregoing reasons, the state court's denial of this claim was neither contrary to, nor an

4   unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.

5   Watkins is not entitled to relief.

6        b.   *Special Circumstance Felony Murder (Claim Nine)*

7        Watkins argues the jury was improperly instructed as to the special circumstance felony murder

8   count because the second paragraph of CALJIC No. 8.81.17 was erroneously left out of the instruction

9   packet provided to the jury.  (Pet. at 24-25; Pet'rs Ex. B.)  Under California law, a special circumstance

10  felony murder may be alleged where the murder occurs during the commission of a felony, but not when

11  the felony occurs during the commission of the murder.  (Lodgment No. 7 at 14-15; *People v. Mendoza*,

12  24 Cal. 4th 130, 182 (2004).)  This is known as the "independent purpose doctrine."  The omitted

13  paragraph of CALJIC No. 8.81.17 informs the jury that they cannot find a felony murder special

14  circumstance true unless they conclude that "[t]he murder was committed in order to carry out or

15  advance the commission of [the felony]" and was not "merely incidental" to the commission of the

16  murder.  (Lodgment No. 7 at 14-15.)

17       Watkins raised this claim on direct appeal as well.  Thus, because the state supreme court denied

18  the claim without citation of authority, the last reasoned state court decision to which this Court must

19  look is the state appellate court's opinion denying the claim.  *See Ylst*, 501 U.S. at 801-06.  In denying

20  this claim, the court wrote:

21            Watkins contends the court erred in giving the incomplete CALJIC No. 8.81.17
          instructions and that the special defense instruction did not cure the problem because it
22        did not require a finding that the murder was committed "to carry out or advance" the
          robbery.  However, the California Supreme Court recently reiterated that a felony-
23        murder special circumstance may be sought whenever a person has a purpose for
          committing the underlying felony that is independent of the murder.  (*People v. Horning*
24        (2004) 34 Cal.4th 871, 907-908; *People v. Navarette* (2003) 30 Cal.4th 458, 505. ) The
          high court noted that "[t]here is nothing magical about [CALJIC No. 8.81.17's] phrase
25        'to carry out or advance' the felony" and held that simply instructing a jury that the
          underlying felony must be more than "merely incidental to the commission of the
26        murder" is adequate to convey the special circumstance's independent purpose
          requirement.  (*People v. Horning*, *supra*, 34 Cal.4th at p.908.)

27

28   ────────────────
         [7]  The court did give a second degree murder instruction, but not on a voluntary intoxication theory.  (*See*
     Lodgment No. 2, vol. 3 at 0684.)

                                   -25-

Here, the court instructed the jury that it could find the special circumstance true only if the prosecution proved that Watkins committed the robbery or burglary for a purpose other than merely facilitating or concealing the murder, "a purpose to commit the felony of robbery [or burglary] *independent of the murder*." (CALJIC No. 8.81.17, italics added.) In accordance with Supreme Court precedent, this instruction accurately

sets forth what is required to support a special circumstance finding and thus we find that the court did not commit instructional error that prejudiced Watkins.

(Lodgment No. 7 at 14-16.)

The crime of special circumstance felony murder is defined under California law as follows:

A felony-murder special circumstance . . . may be alleged when the murder occurs during the commission of the felony, not when the felony occurs during the commission of a murder. [citations omitted.] Thus, to prove a felony-murder special-circumstance allegation, the prosecution must show that the defendant had an independent purpose for the commission of the felony, that is, the commission of the felony was not merely incidental to an intended murder. [citations omitted.]

*People v. Mendoza*, 24 Cal. 4th 130, 182 (2000).

The jury in Watkins's case was instructed on first degree premeditated and deliberate murder and on first degree felony murder. The felony murder instruction told the jury that if they found that the murder occurred "during the commission or attempted commission of the crime of robbery or burglary," the murder was of the first degree if Watkins had the specific intent to commit the robbery or burglary. (Lodgment No. 2, vol. 3 at 0662.) The instructions then told the jury that if they concluded that Watkins was guilty of first degree murder, they were to determine whether the special circumstance allegations of murder in the commission of a robbery or murder in the commission of a burglary were true. (*Id.* at 0665-66.) The special circumstance jury instructions read as follows:

To find that the special circumstance, referred to in these instructions as murder in the commission of a robbery, is true, it must be proved:

The murder was committed while the defendant was engaged in the commission or attempted commission of a robbery in violation of Penal Code section 211.

The elements of the crime of robbery are set forth elsewhere in these instructions.

. . . .

To prove the robbery special circumstance, the People must prove that the defendant committed the robbery for a purpose other than merely to facilitate or conceal the murder. This requires the prosecution to prove that the defendant had a purpose to commit the felony of robbery independent of the murder. If after considering all of the evidence, you have a reasonable doubt that the defendant had such a purpose, you must

give the defendant the benefit of the doubt and find the special circumstance not true.

(*Id.* at 0667.)

/ / /

The burglary special circumstance jury instructions read exactly the same except for the substitution of the word "burglary" for "robbery." (*Id.* at 0668.)

Watkins complains that the jury was not properly instructed that in order to find the special circumstance true, the murder must have been committed for the express purpose of advancing the robbery or burglary because the second paragraph of CALJIC No. 8.81.17 was not included. (Pet. at 24.) The omitted paragraph states that in order to find the special circumstance true, the jury must conclude that "*[t]he murder was committed in order to carry out or advance the commission of the crime of [robbery or burglary]* . . ." and cannot be found "if the [robbery or burglary] was merely incidental to the commission of the murder." (CALJIC No. 8.81.17.) The jury was adequately instructed, however, when they were told that "the prosecution [was required] to prove that the *defendant had a purpose to commit the felony of robbery independent of the murder*." (Lodgment No. 2, vol. 3 at 0667) (emphasis added.) As the state court noted, the California Supreme Court has found that this kind of instruction is sufficient to satisfy California law:

> The point we made in *[People v.] Green, supra,* 27 Cal.3d 1 [citation omitted] is that if the felony was merely incidental to the murder – as the evidence showed it was in *Green* – no separate felony-based special circumstance exists. We have used various phrasings in explaining this requirement, two of which are included in CALJIC No. 8.81.17, but we have never suggested that we had created two separate requirements, or that any precise language was required to explain the concept to the jury. There is nothing magical about the phrase "to carry out or advance" the felony. Indeed, we ourselves have stated the requirement without using that phrase. (See *People v. Mendoza, supra,* 24 Cal.4th at p. 182 [citation omitted]; *People v. Clark* (1990) 50 Cal.3d 583, 608 [citation omitted].) Several ways exist to explain the requirement. Even if it might have been better to give the entire second paragraph of CALJIC No. 8.81.17, the court's explanation that the burglary or robbery must not be "merely incidental to the commission of the murder," adequately conveyed the requirement.

*People v. Horning,* 34 Cal. 4th 871, 907-08 (2004); *see also Mendoza,* 24 Cal. 4th at 182 (citing with approval the "independent purpose" language); *People v. Bonin,* 47 Cal. 3d 808, 850 (1989) (same); *People v. Green,* 27 Cal. 3d 1, 61 (1980) (same).

Moreover, both the jury instructions and the verdict form on first degree felony murder required the jury to conclude that Watkins murdered Brown while he "was engaged in the commission or

-27-

1   attempted commission of" the robbery or burglary.  (Lodgment No. 2, vol. 3 at 0662, 0722.)  This

2   language also communicated the requirement that the felony could not be "merely incidental" to the

3   murder.

4

5   Viewing the instructions as a whole, therefore, as is required by *Estelle v. McGuire*, the Court

6   concludes that the instruction did not "'so  infect[ ] the entire trial that the resulting conviction violates

7   due process.' [citation omitted]." *Murtishaw*, 255 F.3d at 971; *see also Henderson*, 431 U.S. at 154.

8   Accordingly, Watkins has not established that the state court's resolution of this claim was contrary to,

9   or an unreasonable application of, clearly established Supreme Court law, and he is not entitled to relief

10  as to this claim.  *Williams*, 529 U.S. at 412-13.

11          6.      *Fifth Amendment Error (Claims Ten and Eleven)*

12  Watkins final two claims relate to the statement he gave police following his arrest.  The trial

13  court suppressed part of Watkins's statement because it found that Watkins had not been read his rights

14  under *Miranda v. Arizona*, 384 U.S. 436 (1966).  The court admitted, however, the portion of Watkins's

15  statement which followed his waiver of *Miranda*.  Watkins contends first that he never properly waived

16  his *Miranda* rights, and second, that his post-*Miranda* statements should have been suppressed as well.

17  (Pet. at 25-28; Pet'rs Ex. C, D.)

18  Respondent asserts that these two claims are unexhausted because they were not presented to

19  the California Supreme Court either in Watkins's petition for review on direct appeal or in his habeas

20  corpus petitions.  Respondent asks this Court to either deny the claims on the merits pursuant to 28

21  U.S.C. § 2254(b) or dismiss the petition as unexhausted.  (Answer at 27-32.)

22  The Court's March 21, 2007 Order Reopening Case and Setting Briefing Schedule [doc. no. 10]

23  stated as follows:

24          If Respondent contends the Petition can be decided without the Court's reaching
        the merits of Petitioner's claims (*e.g., because Respondent contends Petitioner has failed*

25      *to exhaust any state remedies as to any ground for relief alleged in the Petition*, or that
        the Petition is barred by the statute of limitations, or that the Petition is subject to

26      dismissal under Rule 9 of the Rules Governing § 2254 Cases, or that all of the claims are
        procedurally defaulted, or that Petitioner is not in custody), Respondent shall file a

27      motion to dismiss pursuant to Rule 4 of the Rules Governing § 2254 Cases . . . .

28  (Order Reopening Case, *Watkins v. Scribner*, 07cv0196, Mar. 21, 2007) (emphasis added.)

-28-

Despite the fact that Respondent contends that the claims ten and eleven are unexhausted, and contrary to this Court's Order, Respondent did not file a motion to dismiss.  Accordingly, in the interests of justice and judicial economy, the Court will address the merits of Watkins's claims.  *See* 28 U.S.C. § 2254(b)(2); *see also Cassett v. Stewart*, 406 F.3d 614(9th Cir. 2005) (holding that a federal court may deny an unexhausted claim on the merits "where it is perfectly clear that the applicant does not raise even a colorable federal claim").

    1.    *Watkins's Miranda Waiver*

Watkins first argues that any waiver of his *Miranda* rights was not voluntary, knowing and intelligent because Detective Hergenroeather questioned him briefly before giving Watkins his *Miranda* warnings, and because Hergenroeather "trivialized" the importance of the *Miranda* warning he did give when he prefaced it by saying, "I just got to do the 'ole Jack Web[b] thing."  (Pet. at 25-26; Pet'rs Ex. C.)  The state court suppressed any statements Watkins made to police before he received his *Miranda* warnings.  (Lodgment No. 1, vol. 1 at 268-75.)  Watkins contends that the police questioning which occurred before he was Mirandized rendered any subsequent *Miranda* waiver invalid.

At the beginning of the interrogation and before he was Mirandized, Hergenroeather asked Watkins several innocuous questions, such as whether he needed to go to the bathroom, his name, his mother's name and address and how his teeth got knocked out.  (Lodgment No. 5 at 0002-04.) Hergenroeather then told Watkins that he wanted to talk to him about a warrant that was out for his arrest and where he was on the night of the murder.  (*Id.* at 0004.)  Hergenroeather went on as follows:

JH [James Hergenroeather]: Yeah, I'll explain it to ya.  Um, regarding, uh some jewelry that you may have had.

DW [David Watkins]: Uh, no.  I didn't have no jewelry.

JH: Okay.  Alright.  Alright.  Uh, but you know, I just got, but I'm just telling ya up front that's what I want to talk to you about.

DW: Okay.  Okay.

JH: And were, and, and, and if in fact, I just want to get your side of the story because other people are saying that maybe you could've had some jewelry.

DW: Ah, huh.

JH: And then, I'm interested from where that jewelry came from specifically.

DW: Where I'm gone get some jewelry from?

1    JH: I don't know.  That's what I

2    DW: You know, I, I, like I told you,

3    JH: Yeah.

4
     DW: I work in the store right there on 4, on 47th.
5
     JH: Yeah.
6
     DW: And I do the taco shop, you know.
7
     JH: Yeah.  Okay.  That's cool.  But I just got to do the ole' Jack Web[b] thing,
8    you know what I mean?

9    DW: Yeah.

10   JH:  You've heard this before?

11   DW: Nah, I ain't, I ain't heard this before.

12
     (*Id.* at 0004-05.)
13
             Immediately following this, Hergenroeather informed Watkins of his *Miranda* rights.  Watkins
14
     stated he understood his rights and began answering Hergenroeather's questions.  (*Id.* at 0005.)
15
             Because Watkins raised this claim in his direct appeal to the California appellate court but not
16
     in his petition for review filed in the California Supreme Court, the last reasoned state court decision
17
     to address this claim is the state appellate court's opinion denying it. Citing *Moran v. Burbine*, 475 U.S.
18
     412 (1986), that court stated that in determining whether a *Miranda* waiver is valid, a court must
19
     consider two prongs:  first, whether the relinquishment of the right was "the product of a free and
20
     deliberate choice rather than intimidation, coercion or deception."  (Lodgment No. 7 at 5) (quoting
21
     *People v. Combs*, 34 Cal. 4th 821, 845 (2004) and *Moran*, 475 U.S. at 421.) Second, whether the waiver
22
     was made "with a full awareness of both the nature of the right being abandoned and the consequences
23
     of the decision to abandon it." (Lodgment No. 7 at 5.)  The court noted that in assessing whether these
24
     two requirements have been met, a court is to look at the totality of the circumstances.  (*Id.*)  Applying
25
     this to the facts of Watkins's case, the court found as follows:
26
             Watkins contends that the trial court should have excluded the entirety of his
27           interview with police, rather than merely the portions before the advisement and after he
             requested an attorney, on the ground that he did not knowingly and intelligently waive
28           his *Miranda* rights.  (We observe that, throughout the interview, Watkins consistently
             maintained that he was not involved in the killing or the theft of Brown's jewelry and

other items; thus, none of the statements he made during the interview was particularly damning.)  Preliminarily, Watkins asserts that the officers' failure to Mirandize him at the outset infected the entire interrogation because "the pump was already primed and running by the time the *Miranda* warnings were belatedly administered."  However, the fact that the officers did not immediately advise Watkins of his *Miranda* rights does not necessarily render his post-advisement statements inadmissible.  (See *People v. Bradford, supra,* 14 Cal.4th at pp. 1033, 1039; compare *Missouri v. Seibert,* (2004) __ U.S. __, [124 S.Ct. 2601, 2610].)  Rather, the threshold question in determining the admissibility of statements when law enforcement officers do not give a *Miranda* advisement at the outset of questioning (that is when they question first and warn later) is whether the warnings functioned effectively to advise the defendant of his rights and to put him in a position to make an informed choice about whether to talk to the officers thereafter.  (*Missouri v. Seibert, supra,* __ U.S. __, [124 S.Ct. at p. 2610].)

Here, the trial court considered the circumstances of the interrogation and found that once Watkins was advised of his rights (which happened shortly after the interrogation started and before any significant questioning or incriminating statements were made), he freely and voluntarily waived those rights by continuing to respond to the detectives' questions.  In doing so, the court implicitly found that the officers' *Miranda* warning was effective in advising Watkins of his constitutional rights.  Watkins challenges the court's implicit finding, contending that the officers' administration of the *Miranda* warnings was deficient in several respects.

First, he contends that Detective Hergenroeather improperly trivialized his rights by prefacing the advisement with the comment "I just got to do the ole' Jack [Webb] thing, you know what I mean?"  However, although the trial court understandably expressed concern about Detective Hergenroeather's comment, it also found that the comment did not have any impact on Watkins.  It observed that 36-year-old Watkins was apparently "not old enough to remember Jack Webb from Dragnet," a finding that is substantiated by the record.  In light of Watkins's lack of understanding as to the significance of the comment, its making did not render the advisement ineffective, nor did it render his waiver of rights invalid.

(Lodgment No. 7 at 7-9.)

Clearly established Supreme Court law states that a suspect who is subject to custodial interrogation must be advised of his federal constitutional right to remain silent and his right to have an attorney present during questioning.  *Miranda v. Arizona,* 384 U.S. 436 (1966).  A defendant may waive his *Miranda* rights, but the waiver must be voluntary, knowing and intelligent.  *Moran,* 475 U.S. at 421.  As the state court noted, there are two inquiries to be made in determining whether a *Miranda* waiver is valid:

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. [citations omitted.]

07cv0196

1   *Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).

2       The state court correctly identified and applied controlling United States Supreme Court

3   authority in evaluating Watkins's claim.  The state court considered the circumstances surrounding the

4   interrogation, as required by *Moran*, and found that, considering the totality of  the circumstances,

5   Watkins's waiver was voluntary.  Indeed, the present case falls somewhere between *Oregon v. Elstad*,

6   470 U.S. 298 (1985), where the Court found pre-*Miranda* questioning of a suspect in the living room

7   of his house to be sufficiently  noncoercive as to have no effect on a subsequent *Miranda* waiver, and

8   *Missouri v. Seibert*, 542 U.S. 600 (2004), in which the Court concluded a police policy of extracting a

9   confession without giving *Miranda* warnings, then extracting a second confession after giving warnings,

10   rendered the *Miranda* waiver invalid.

11       In *Elstad*, officers arrived at the defendant Elstad's home with a warrant for his arrest on

12   suspicion of burglarizing his neighbor's house.  (*Id.* at 300.)  One officer spoke to Elstad's mother in

13   the kitchen.  The other officer spoke to Elstad in the living room, asking whether he knew why they

14   were there and whether Elstad knew the neighbor who had been burglarized.  (*Id.* at 300-01.)  Elstad

15   responded that he did and that he had heard they had been burglarized.  (*Id.* at 301.)  The officer then

16   told Elstad he thought he was involved in the burglary, and Elstad responded that he was there.  (*Id.*)

17   Elstad was then taken to police headquarters where he was given his *Miranda* warnings and made a

18   confession. (*Id.*) Elstad argued that his second statement should be suppressed because the pre-*Miranda*

19   questioning at Elstad's house tainted the second, Mirandized statement.  The Supreme Court held the

20   second statement admissible, stating that "the admissibility of any subsequent statement should turn in

21   these circumstances solely on whether [the statement] is knowing and voluntarily made." *Elstad*, 470

22   U.S. at 309.  The Court noted that the pre-*Miranda* questioning in *Elstad* was not coercive and appeared

23   to be merely an oversight by the officer.  The Court concluded that "[w]e hold today that a suspect who

24   has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his

25   rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* at 318.

26       By contrast, the Court was confronted with a much more egregious *Miranda* violation in *Seibert*.

27   Siebert was a suspect in the murder of a mentally ill teenager who was living with her family.  The

28   teenager died in a fire set by one of Seibert's sons and his friend, at Seibert's direction, to cover up the

1   natural death of Seibert's other son, who had cerebral palsy.  Seibert came up with the plan to hide her

2   disabled son's death with the fire because she feared she would be prosecuted for neglect.  *Seibert*, 424

3   U.S. at 604-05.  Without Mirandizing her, police questioned Seibert about the fire and obtained a

4   confession.  *Id.* at 605-06.  Police then Mirandized Seibert, re-interrogated her and obtained the same

5   confession again.  *Seibert*, 542 U.S. at 605-06.  At the hearing on the motion to suppress, officers

6   testified that this procedure was department policy.  *Id.*  The Court suppressed Seibert's second

7   confession, concluding that this procedure "'deprived a defendant of knowledge essential to his ability

8   to understand the nature of his rights and the consequences of abandoning them.'" *Id.* at 613-14 (quoting

9   *Moran*, 475 U.S. at 424.)

10   The failure to advise Watkins of his *Miranda* rights was not as apparently "innocent" as the

11   officers' failure in *Elstad*.  The officer in *Elstad* testified he wanted to make sure Elstad and his mother

12   knew why police were there, and the circumstances surrounding the questioning – a brief conversation

13   with the suspect in his home and not direct questioning about guilt – was not coercive.  *Elstad*, 470 U.S.

14   at 314-15.  In contrast, the pre-*Miranda* questioning of Watkins took place at a more coercive location,

15   the police station, and Watkins was under arrest.  While most of the questions officers asked Watkins

16   pre-*Miranda*  were innocuous, such as his name and address, the officers did tell Watkins they wanted

17   to ask him "where he was last night," and to discuss with him "some jewelry that you may have had,"

18   where he would have gotten such jewelry and that they wanted to hear his side of the story.  (Lodgment

19   No. 5 at 0004.)  These questions were more investigative than those in *Elstad*.  The interaction was not,

20   however, nearly as egregious as *Seibert*, where officers purposely prevented the suspect from invoking

21   her *Miranda* rights by extracting a non-Mirandized confession from her, then informing her of her

22   *Miranda* rights and extracting an additional, sanitized confession to use against her in court.  In

23   Watkins's case, the officers did not engage in serious questioning about the murder and theft until after

24   they had given Watkins his *Miranda* rights and he agreed to speak with them.

25   All in all, the Court concludes that Watkins' police encounter falls more closely on the spectrum

26   to *Elstad* than to *Seibert*.  *See also Terrovona v. Kincheloe*, 912 F.2d 1176 (9th Cir. 1990) (finding a

27   valid *Miranda* waiver when defendant responded to questions after being given his *Miranda* rights and

28   demonstrated an ability to assert his rights when he objected to the search of his apartment and asked

1   for an attorney.)   The state court's consideration of the totality of the circumstances surrounding

2   Watkins's interrogation and its conclusion that neither the "Jack Webb" comment nor the questioning

3   / / /

4   prior to the *Miranda* advisement rendered Watkins's waiver involuntary, was neither contrary to, nor

5   an unreasonable application of, clearly established Supreme Court law.

6           Watkins also argues that his *Miranda* waiver was not valid because he did not expressly waive

7   his *Miranda* rights.   The state appellate court concluded that under the totality of the circumstances,

8   Watkins's waiver was voluntary, knowing and intelligent:

9               Second, Watkins contends that the officers' failure to expressly ask him whether
            he was willing to waive his rights makes it unclear as to whether his waiver was knowing
10          and intelligent.   The law is well established that a defendant may impliedly waive his
            *Miranda* rights where he is informed of those rights, indicates that he understands those
11          rights and thereafter answers the officers' questions.   (*Moran v. Burbine*, *supra*, 475 U.S.
            at pp. 422-423; *People v. Sully* (1991) 53 Cal.3d 1195, 1233.)   Watkins contends,
12          however, that in light of his background (a homeless person with a limited education and
            a low IQ) and his intoxication at the time of the interrogation, he did not impliedly waive
13          his rights by talking to the officers.

14              Here, the trial court reviewed the video and audio tapes and found that nothing
            in Watkins's demeanor or conduct suggested that he was so incapacitated or incompetent
15          as to be unable to knowingly and intelligently waive his rights.   (See *People v. Clark*
            (1993) 5 Cal.4th 950, 987-988 ["[a]ll that is required is that the defendant comprehend"
16          the information contained in the advisement].)   Our own review of the evidence confirms
            the trial court's conclusions.   During the interrogation Watkins was alert, could recall
17          relevant information and did not have difficulty understanding or responding to the
            officers' questions.   Further, almost an hour after being advised that he had a right to
18          counsel, Watkins exercised that right by requesting the assistance of an attorney.   In
            addition, we find nothing in the record to suggest that Watkins did not understand what
19          was happening.   We agree with the trial court's conclusion that, once the officers gave
            the advisement, Watkins understood his rights and impliedly waived those rights by
20          talking to the officers thereafter.

21   (Lodgment No. 7 at 7-9.)

22          As the state court noted, the Supreme Court has held that a *Miranda* waiver need not be express.

23   *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).   "The question is not one of form, but rather

24   whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda*

25   case.   *Id.*; *see also Juan H. v. Allen*, 408 F.3d 1262, 1271 (9th Cir. 2005).   Indeed, the Court in *Butler*

26   stated that "in at least some cases waiver can be clearly inferred from the actions and words of the

27   person interrogated."   *Butler*, 441 U.S. at 373.   "[T]he question of waiver must be determined on 'the

28   particular facts and circumstances surrounding [the] case, including the background, experience, and

1    conduct of the accused." *Id.* at 374.

2        Again, the state court correctly identified and applied clearly established Supreme Court law in

3    its resolution of this claim.  Upon hearing his *Miranda* rights, Watkins stated explicitly that he

4    understood his rights.  (Lodgment No. 5 at 0005.)  When Hergenroeather asked Watkins whether he

5    wanted to talk to him, Watkins replied "What jewelry though?," and continued to answer questions put

6    to him.  (*Id.* at 0005-60.)  Both the trial court and the appellate court reviewed the videotape of the

7    interrogation and concluded that Watkins understood what was happening.  Finally, the appellate court

8    noted that Watkins requested an attorney near the end of the interrogation, lending further support to

9    the conclusion that Watkins understood his rights and knowingly and intelligently waived them.  This

10   Court finds nothing in the record which would undermine this conclusion.  Accordingly, the state court's

11   denial of this claim was neither contrary to, nor an unreasonable application of, clearly established

12   Supreme Court law.  *Williams*, 529 U.S. at 412-13.

13           2.    *Admission of Watkins's Post-Miranda Statement*

14       Watkins also claims that his post-*Miranda* statements should not have been admitted because

15   they were not voluntary.  (Pet. at 26-27.)  The last reasoned state court decision on this claim is also the

16   state appellate court's opinion denying it, which stated;

17           Watkins contends the totality of the circumstances suggests that his statements
18       were not voluntary.  He points to Detective Hergenroeather's "Jack Webb" comment and
         to the fact that later in the interrogation, the officers kept questioning him after he
19       requested an attorney, arguing that these circumstances show that the interrogating
         officers intended to circumvent his *Miranda* rights and to elicit incriminating statements
20       by any means.  However, the relevant question is not what the officers might have
         intended, but instead whether Watkins's implied waiver of rights resulted from coercion
21       on their part.  (*People v. Clark*, *supra*, 5 Cal.4th at p. 988.)

22           Watkins relies on what he characterizes as the detectives' misrepresentations
         about the significance of him having had jewelry on the night of Brown's killing as the
23       basis for arguing that his waiver was coerced.  He points to Detective Hergenroeather's
         statement that it was "fine" if he had had some of Brown's jewelry, but that he should
24       tell the officers where he got it.  However, the officers had already told Watkins about
         third party reports that he had the jewelry and indicated that he had gotten himself
25       "involved in something," that the situation was serious and that it did not "look real
         good" because he appeared to be holding back relevant information about the killing or
26       who was involved.  Further, they had previously warned Watkins that if he was lying
         about the jewelry, "then we're going to think you were doing some other things" and
27       maybe could have been involved in the killing and they questioned him repeatedly about
         his visit to Brown's house on the day of the killing and what he had done while he was
28       there. Given this context, Detective Hergenroeather's statements did not imply any type
         of leniency, but instead urged Watkins to respond honestly to their questions.

-35-

1
2
3

       Based on a review of the totality of the circumstances, we conclude that Watkins's statements to the detectives were voluntary.  The officers gave Watkins *Miranda* warnings and questioned him for approximately one hour. There is no evidence that they mistreated him in any way (by depriving him of food, sleep, access to restroom facilities, etc.) during the course of the interrogation, which was conducted in a fairly

4
5
6
7

relaxed manner.  As discussed above, Detective Hergenroeather's statement that if Watkins had jewelry on the night in question "that's fine, just tell me where you got it" and his encouragement that Watkins cooperate because "we don't want you to get into any more trouble" simply do not bear the hallmarks of improper interrogation tactics that would have deprived Watkins of his free will.  The court did not err in admitting the statements Watkins made after being advised of his rights and before requesting an attorney.

8   (Lodgment No. 7 at 9-11.)

9          The Fifth Amendment bars the use of an involuntary confession against a defendant.  *Jackson*

10   *v. Denno*, 378 U.S. 368, 385-86 (1964).  However, "a confession is involuntary only if the police use

11   coercive means to undermine the suspect's ability to exercise his free will."  *Henry v. Kernan*, 197 F.3d

12   1021, 1026 (9th Cir. 1999) (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)).  A court must

13   consider the totality of the circumstances in determining voluntariness, including factors such as "the

14   surrounding circumstances and the combined effect of the entire course of the officers' conduct upon

15   the defendant."  *Id.* (citing *United States v. Polanco*, 93 F.3d 555, 560 (9th Cir. 1996)); *Schneckloth v.*

16   *Bustamante*, 412 U.S. 218, 226 (1973).  The court must determine whether the confession is the product

17   of the defendant's free will or whether his will was overborne.  *Henry*, 197 F.3d at 1026-27 (citing

18   *Collazo v. Estelle*, 940 F.2d 411, 416 (9th Cir. 1991) (en banc)); *see also United States v. Guerrero*, 847

19   F.2d 1363, 1366 & n. 1 (9th Cir. 1988) (citing *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (per curiam)).

20          Although the state court did not cite United States Supreme Court authority in its analysis of this

21   claim, the court did properly apply the principles of that authority when it considered the totality of the

22   circumstances surrounding Watkins's statement and concluded that it was voluntary.  *See Early*, 537

23   U.S. at 8 (stating that "so long as neither the reasoning nor the result of the state-court decision

24   contradicts [Supreme Court precedent,]" the state court decision will not be "contrary to" clearly

25   established federal law.)  The court noted that although Hergenroeather told Watkins that it was "fine"

26   if he admitted to having some jewelry the night of Brown's murder, he and Detective Michael Ott did

27   not explicitly or implicitly promise any leniency in return for Watkins's statement. (*See* Lodgment No.

28   5.)  The court also pointed out that the detectives did not threaten Watkins or deprive him of any thing

07cv0196

1   such as a bathroom, food, drink or sleep.  There was no evidence of raised voices or physical threats.

2   There is simply nothing to establish that Watkins's will was overborne in such a way as to make his

3   statement involuntary.  Thus, for the foregoing reasons, the state court's denial of this claim was neither

4   contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529

5   U.S. at 412-13.

6   **IV.    CONCLUSION AND RECOMMENDATION**

7           The Court submits this Report and Recommendation to Chief United States District Judge

8   Thomas J. Whelan under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District

9   Court for the Southern District of California. For the reasons outlined above, **IT IS HEREBY**

10  **RECOMMENDED** that the Court issue an Order:  (1) approving and adopting this Report and

11  Recommendation, and (2) directing that Judgment be entered denying the Petition.

12          **IT IS ORDERED** that no later than **May 2, 2008,** any party to this action may file written

13  objections with the Court and serve a copy on all parties.  The document should be captioned

14  "Objections to Report and Recommendation."

15          **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and

16  served on all parties no later than ten days after being served with the objections.  The parties are

17  advised that failure to file objections within the specified time may waive the right to raise those

18  objections on appeal of the Court's order.  *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998);

19  *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

20

21  DATED:  April 4, 2008

22

23                                          LOUISA S PORTER
                                            United States Magistrate Judge
24

25

26

27

28

07cv0196