FILED

08 JUN 19 PH 4: 30

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____

DEPUTY

1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID DION WATKINS, | CASE NO. 07-CV-0196 W (POR) |
| Petitioner, | **ORDER ADOPTING REPORT AND RECOMMENDATION** (Doc. No. 24) |
| vs. | |
| L.E. SCRIBNER, et. al., | |
| Respondents. | |

On January 29, 2007, Petitioner David Dion Watkins ("Watkins" or "Petitioner"), a state prisoner proceeding *pro se*, commenced this habeas corpus petition pursuant to 28 U.S.C. § 2254. Watkins challenges his San Diego County Superior Court conviction for one count of murder, one count of robbery, one count of willful cruelty to an elder, and one count of burglary. (*Lodgment 2*, vol. 3 at 722–26.) On April 4, 2008, United States Magistrate Judge Louisa S. Porter issued a Report and Recommendation ("Report") recommending that the Court deny Watkins's habeas request. (Doc. No. 24.) On April 22, 2008, Watkins timely submitted Objections. (Doc. No. 26.) The Court decides the matter on the papers submitted and without oral argument. See S.D. Cal. Civ. R. 7.1.(d.1). For the reasons discussed below, the Court **ADOPTS** the Report, **OVERRULES** Watkins's Objections, and **DENIES** the Petition.

///
///

07cv0196W

1    I.       BACKGROUND

2            On October 20, 2001, Watkins killed eighty-two-year-old widow Lillie Mae

3    Brown by repeatedly stabbing and strangling her. (*Lodgment 7* at 2.)  Police officers

4    responding to Brown's house found it in disarray, though the officers found no sign of

5    forced entry.  (*Id.*)  The officers took fingerprints from a jar, a bathroom counter and

6    toilet, a telephone in the master bedroom, and jewelry boxes in the house.  (*Id.*)  The

7    officers also found a jacket on the dining room floor.  (*Id.*)  The fingerprints and jacket

8    were later identified as belonging to Watkins.  (*Id.*)

9            On October 21, 2001, a friend of Watkins informed police that Watkins had

10   attempted to sell her some jewelry the previous evening.  (*Id.*)  Detectives James

11   Hergenroeather ("Hergenroeather")and Michael Ott ("Ott") arrested Watkins on an

12   outstanding misdemeanor warrant and took him to police headquarters for questioning.

13   (*Id.*)  At the outset of the interview, Watkins informed the detectives that he had

14   consumed beer and smoked crack cocaine shortly before his arrest.  (*Id.*)   Before

15   advising him of his <u>Miranda</u> rights, Hergenroeather asked Watkins whether he had tried

16   to sell some jewelry the night before.  (*Id.*)  Watkins denied having any jewelry in his

17   possession.  (*Id.*)

18           Following Watkins's initial denial, Hergenroeather told Watkins that he had to

19   do the "[o]l' Jack Webb thing," and advised Watkins of his <u>Miranda</u> rights.  (*Pet.* at 27[1];

20   *Petr.'s Ex. D.*)  Following the advisement, Watkins indicated that he understood his

21   rights and continued to answer the officers' questions.  (*Lodgment 7* at 3.)  Watkins

22   continued to deny that he knew about or had any of Brown's jewelry, though he

23   admitted to the officers that he was one of the few people that Brown would allow in

24   her home.  (*Id.*)  He stated that he performed yard work for Brown the previous

25   afternoon and that he entered her home at that time.  (*Id.* at 2–3.)  Watkins also

26   claimed that James Lauderdale (a.k.a. "Cigarette Man") gave him some jewelry and

27

28           [1] The Court has renumbered the pages of Watkins' petition sequentially to aid in
referring to the proper pages.

1    clocks to sell, and that he sold those items for crack cocaine. (*Id.* at 3.)   However,
2    Watkins consistently denied any involvement in Brown's murder. (*Id.*)
3         After being questioned, Watkins took Hergenroeather and Ott to his girlfriend's
4    apartment, where the detectives recovered clocks, jewelry, and other items belonging
5    to Brown. (*Id.*)   Upon returning to the police station, the detectives resumed
6    questioning Watkins. (*Id.*)   At that time, Watkins requested several times to speak to
7    an attorney. (*Id.*; *Lodgment 5* at 60–62.)   The detectives subsequently, albeit not
8    immediately, ceased questioning Watkins. (*Lodgment 7* at 3.)
9         Several hours after Watkins's initial interrogation, officers tested Watkins's blood
10   for alcohol and drugs. (*Id.*)   The test results showed that Watkins's blood alcohol level
11   was .11 to .12, and that his system contained cocaine, phencyclidine (PCP), and
12   metabolites. (*Id.*)
13        The trial court granted Watkins's pre-trial motion to suppress his statements
14   made to police before being given the <u>Miranda</u> advisement and those made after asking
15   to speak with an attorney. (*Lodgment 7* at 4.)   The court found, however, that after
16   being advised of his rights, Watkins knowingly and intentionally waived those rights
17   until he asked to speak to an attorney. (*Id.*)   Thus, the statements following the
18   <u>Miranda</u> advisement (but prior to Watkins's request to speak with an attorney) were
19   admissible. (*Id.*)
20        At trial, the prosecutor introduced evidence of the events surrounding Brown's
21   death, including blood evidence found on Watkins's clothing and penile swabs taken
22   from Watkins's person. (*Id.* at 4; *Report* at 7–10.)   In his defense, Watkins introduced
23   evidence that he possessed Brown's jewelry in the early afternoon of October 20, 2001,
24   hours before Brown was killed. (*Lodgment 7* at 4.)   Watkins also introduced expert
25   testimony that he had an IQ of sixty-nine and suffered from brain impairment (perhaps
26   resulting from long-term drug and alcohol use) that limited control of his "short-range
27   impulses." (*Id.*)
28

1    A jury convicted Watkins of first-degree murder, first-degree robbery, willful

2 cruelty to an elder, and burglary.  (*Lodgment 2*, vol. 3 at 722–26.)  The jury also found

3 the felony murder special circumstances allegations true.  (*Id.*)

4    Watkins appealed his conviction to the California Court of Appeal, which upheld

5 both his conviction and sentence.  (See *Lodgments 6, 7*.)  Watkins then filed a Petition

6 for Review in the California Supreme Court, which that court denied.  (See *Lodgments*

7 *8, 9*.)

8    On January 9, 2006, Watkins sought habeas relief in San Diego County Superior

9 Court.  (See *Lodgment 10*.)  That court denied the petition in an unpublished written

10 opinion.  (See *Id.*)  Watkins next filed a habeas petition in the California Court of

11 Appeal, which the court denied in an unpublished written opinion.  (See *Lodgment 11*.)

12 Finally, Watkins filed a habeas petition in the California Supreme Court, which the

13 court denied.  (See *Lodgment 12*.)

14    On January 29, 2007, Watkins filed this federal habeas corpus petition

15 ("Petition") pursuant to 28 U.S.C. § 2254.  (*Report* at 5; see Doc. No. 1.)  Watkins

16 contends that his federal constitutional rights were violated when: (1) the prosecutor

17 committed misconduct by presenting false reports and perjured testimony; (2) his trial

18 and appellate attorneys ineffectively failed to challenge this false and perjured evidence,

19 failed to impeach a detective who sent an allegedly improper letter to the DNA lab, and

20 failed to investigate and present evidence of unidentified blood on Watkins's clothing;

21 (3) the prosecutor improperly excluded African-Americans from his jury; (4) the trial

22 court improperly refused to instruct on the consequences of voluntary intoxication and

23 improperly instructed the jury on the felony murder charge; and (5) the admission of

24 his statements to police violated his Fifth Amendment right against self-incrimination.

25 (*Pet.* at 6–9, 12–28.)  On July 12, 2007, Respondent filed an answer to the petition.

26 (Doc. No. 22.)  On April 4, 2008, Magistrate Judge Porter recommended that the

27 Court deny Watkins's habeas request.  (*Report* at 2.)  On April 22, 2008, Watkins

28

07cv0196W

1    timely submitted objections ("Objections"). (*Objections* at 3–4.)[2] The Court addresses

2    these Objections in the Discussion below.

3

4    **II.   LEGAL STANDARD**

5         The duties of a district court in connection with a magistrate judge's report and

6    recommendation are set forth in Rule 72(b) of the Federal Rules of Civil Procedure and

7    28 U.S.C. § 636(b)(1). The district court "must make a *de novo* determination of those

8    portions of the report ... to which objection is made," and "may accept, reject, or

9    modify, in whole or in part, the findings or recommendations made by the magistrate."

10   28 U.S.C. § 636(b)(1)(C); see also United States v. Raddatz, 447 U.S. 667, 676 (1980);

11   United States v. Remsing, 874 F.2d 614, 617 (9th Cir. 1989).

12        A federal court may grant a habeas petition if it shows the applicant is in custody

13   "in violation of the Constitution or other laws or treaties of the United States." 28

14   U.S.C. § 2254(a). State interpretation of state laws and rules cannot serve as the basis

15   for a federal habeas petition, as no federal or constitutional question would be

16   implicated. Estelle v. McGuire, 502 U.S. 62, 68 (1991). Habeas petitions are governed

17   by the provisions of the 1996 Antiterrorism and Effective Death Penalty Act

18   ("AEDPA").

19        Pursuant to AEDPA, a federal court may grant habeas corpus relief from a state

20   court judgment only if the adjudication was (1) contrary to, or involved an

21   unreasonable application of, clearly established federal law, or (2) was based on an

22   unreasonable determination of the facts in light of the evidence presented in the state

23   court proceedings. 28 U.S.C. § 2254(d); Early v. Packer, 537 U.S. 3, 7–8 (2002).

24        A state-court decision is "contrary to clearly established federal law" if it (1)

25   applies a rule that contradicts the governing law set forth in Supreme Court cases, or

26   (2) confronts a set of facts that are materially indistinguishable from a decision of the

27

28

---

[2] The Court has renumbered the pages of Watkins' objection sequentially to aid in referring to the proper pages.

1   Supreme Court and nevertheless arrives at the opposite result. <u>Williams v. Taylor</u>, 529
2   U.S. 362, 405 (2000). A state-court decision is an unreasonable application of the rule
3   "if the state court identifies the correct governing legal principle from [the Supreme
4   Court's] decisions but unreasonably applies that principle to the facts of the prisoner's
5   case." <u>Id.</u> at 413.

6

7   **III.   DISCUSSION**

8        Having read and considered the underlying Petition, Report, and Objections
9   thereto, the Court concludes that the Report presents a well-reasoned analysis of the
10  issues raised in the Petition. For the following reasons, the Court finds that the Report
11  correctly concluded that Watkins is not entitled to federal habeas relief.

12

13       **A.   CRIMINALIST CORNACCHIA DID NOT TESTIFY INCONSISTENTLY AND**
14           **THUS PRESENTATION OF HIS TESTIMONY DID NOT CONSTITUTE**
15           **PROSECUTORIAL MISCONDUCT**

16       Watkins alleges that the prosecutor violated his due process rights by presenting
17  perjured testimony and false laboratory reports regarding blood evidence on Watkins's
18  clothing and regarding two penile swabs taken from Watkins's person. (*Pet.* at 6,
19  12–13.) Criminalist David Cornacchia ("Cornacchia") testified at a preliminary hearing
20  that he had found one small stain on Watkins's boxer shorts that presumptively tested
21  positive for blood, and that he had not tested penile swabs taken from Watkins's person
22  for blood. (*Id.*) Watkins asserts that Cornacchia perjured himself by testifying at trial
23  that he found two stains on the boxer shorts that tested positive for blood, and that he
24  performed a presumptive blood test on the penile swabs and obtained a negative result.
25  (*Id.*) The Magistrate Judge concluded that Watkins failed to present any evidence that
26  Cornacchia perjured himself in his testimony regarding this evidence. (*Report* at 7–10.)
27  Watkins's Objections do not raise any arguments that Watkins did not previously raise
28  in his Petition. (*Objections* at 7–8, 10; *Pet.* at 6, 8, 12–13.)

1       Under clearly established Supreme Court law, "[t]he knowing use of perjured

2  testimony by a prosecutor generally requires that the conviction be set aside." Killian

3  v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002) (citing United States v. Agurs, 427 U.S.

4  97, 103 (1976)); see also Napue v. People of the State of Illinois, 360 U.S. 264, 269

5  (1959) ("The same result obtains when the State, although not soliciting false evidence,

6  allows it to go uncorrected when it appears."). However, inconsistencies in a witness's

7  testimony "do not of themselves indicate that the witness committed perjury." Riley

8  v. Wilson, 430 F.2d 1134, 1136 (9th Cir. 1970) (per curiam); see also United States v.

9  Sherlock, 962 F.2d 1349, 1364 (9th Cir. 1989) (holding that prosecutor's presentation

10 of contradictory testimony did not constitute knowing presentation of perjured

11 testimony).

12      A review of the record supports the California Court of Appeal's conclusion that

13 Cornacchia's testimony regarding both the blood evidence and penile swabs was not

14 inconsistent. On February 15, 2002, Cornacchia testified at a preliminary hearing that

15 he found a small stain on Watkins's boxer shorts, which presumptively tested positive

16 for blood. (Lodgment 3 at 156.) Cornacchia subsequently testified at trial that he found

17 a second blood-like stain on Watkins's boxer shorts after performing the initial blood

18 test, but before sending the shorts to an outside laboratory for DNA testing. (Lodgment

19 1, vol. 4 at 1122–26.) Cornacchia's testimony simply suggests that he overlooked the

20 second stain at the time of the preliminary hearing. Because Cornacchia had not

21 discovered the second stain at the time of the preliminary hearing, he did not testify

22 inconsistently—nor did he perjure himself—by testifying about the second stain at trial.

23 The fact that Cornacchia had the opportunity to examine the evidence more

24 thoroughly between the two proceeding fully explains the alleged discrepancy in his

25 testimony.

26      Similarly, regarding the penile swabs, Cornacchia testified at the February 15,

27 2002, preliminary hearing that he conducted a DNA analysis on the swabs and tested

28 for sperm cells, but that he did not perform a presumptive blood test. (Lodgment 3 at

150–51, 153.)  On February 27, 2002, Cornacchia performed a presumptive blood test on the same penile swabs at the prosecution's request.  (*Lodgment 1*, vol. 5 at 1195.) Cornacchia subsequently testified about the negative test results at trial.  (*Id.* at 1158–59.)  Because he had not performed the presumptive blood test at the time of the preliminary hearing, Cornacchia could not have testified about the results at the hearing and thus did not testify inconsistently at trial.[3]

The California Court of Appeal's decision denying Watkins's habeas petition is the last reasoned state court decision on this issue.  (See *Lodgment 11*.)  The court held that Watkins failed to present evidence that Cornacchia testified inconsistently and thus failed to state a prima facie claim for relief.  (*Id.* at 3–4.)  This Court is not called to decide whether it agrees with the state court's decision or whether it would have reached the same conclusion; rather, the Court inquires only whether the state court's decision was objectively unreasonable.  Yarborough v. Gentry, 540 U.S. 1, 5 (2003). Based on the record, the Court finds Petitioner has failed to show that the state court's determination was objectively unreasonable.  Accordingly, the Court **ADOPTS** the Report, **OVERRULES** Petitioner's objections and **DENIES** Petitioner's prosecutorial misconduct claim.

B.   WATKINS FAILS TO DEMONSTRATE THAT COUNSEL'S ALLEGEDLY DEFICIENT PERFORMANCE PREJUDICED HIS DEFENSE

Watkins asserts that both his trial and appellate counsel were ineffective (1) for failing to challenge Cornacchia's testimony and the test results on the boxer shorts and penile swabs; (2) for failing to investigate an allegedly improper letter sent by Detective James Tomsovic ("Tomsovic") to the DNA lab; (3) for failing to cross-examine Tomsovic regarding the letter; and (4) for failing to investigate and present evidence

---

[3] Watkins also argues that Cornacchia's testimony led the jury to believe that "the penile swabs contained blood and that Mr. Cornacchia's presumptive chemical test was not sensitive enough to detect it."  (*Pet.* at 8, 15; see also *Objections* at 10.)  However, it was the defense which presented evidence that the swabs tested positive for blood using a more sensitive test.  (*Lodgment 1*, vol. 10 at 1943–49.)

1   of unidentified blood found on Watkins's shoes.[4]   (*Pet.* at 7, 9, 14, 16–20.)   After

2   reviewing the record, the Magistrate Judge concluded that Watkins was not entitled to

3   relief as to these claims, because he failed to demonstrate how counsel's allegedly

4   deficient performance prejudiced his defense. (*Report* at 11–15.) Watkins's Objections

5   to the Report with respect to these claims consist of a verbatim recitation of his original

6   Petition.   (*Objections* at 9, 11–15.)   Accordingly, the Court addresses the claims as

7   raised in the original Petition.

8        To establish ineffective assistance of counsel, a habeas petitioner must first show

9   "that counsel made errors so serious that counsel was not functioning as the 'counsel'

10   guaranteed the defendant by the Sixth Amendment." <u>Strickland v. Washington</u>, 466

11   U.S. 668, 687 (1974). A reviewing court must give significant deference to the strategic

12   decisions of counsel. <u>Id.</u> at 689–90. Second, the petitioner must show that counsel's

13   deficient performance prejudiced his defense by depriving him "of a fair trial, a trial

14   whose result is reliable." <u>Id.</u> In order to satisfy this second prong, the petitioner must

15   demonstrate "that there is a reasonable probability that, but for counsel's unprofessional

16   errors, the result of the proceeding would have been different." <u>Id.</u> at 694. This inquiry

17   must be considered in light of the strength of the prosecution's case. <u>Luna v. Cambra</u>,

18   306 F.3d 954, 966 (9th Cir. 2002), <u>amended</u>, 311 F.3d 928 (9th Cir. 2002).

19        As discussed above, there were no discrepancies between Cornacchia's testimony

20   about the blood evidence and penile swabs at the preliminary hearing and his testimony

21   about those items at trial. Thus, counsel had no opportunity to impeach Cornacchia's

22   credibility by pointing out any inconsistent or potentially perjured testimony, and

23   counsel did not—could not—err by failing to do so.

24

25

26        [4] Watkins raises the same claims with respect to his appellate counsel that he raises with respect to his trial counsel. (*Pet.* at 7, 9, 14, 16–20; <u>see also</u> *Objections* at 9, 11–15.)

27   Because "the proper standard for evaluating [a] claim that appellate counsel was ineffective . . . is that enunciated in" <u>Strickland v. Washington</u>, 466 U.S. 668 (1974) (establishing the

28   standard for evaluating ineffective-assistance-of-trial-counsel claims), the following analysis applies to both trial and appellate counsel. <u>Smith v. Robbins</u>, 528 U.S. 259, 285 (2000).

1    Cornacchia's testimony established that blood consistent with Brown's DNA

2    profile was present on one stain on the front of Watkins's boxer shorts. (*Lodgment 1*,

3    vol. 4 at 1141–42.) Even assuming that counsel performed deficiently under the first

4    prong of <u>Strickland</u>, Watkins does not indicate how trial counsel's failure to cross-

5    examine Cornacchia regarding the second stain prejudiced his defense.

6    Similarly, the record indicates that Cornacchia had not tested the penile swabs

7    for blood prior to the preliminary hearing, but that he did test the swabs prior to trial

8    at the prosecution's request. (*Lodgment 3* at 156; *Lodgment 1*, vol. 4 at 1122–26.)

9    Watkins fails to indicate how the results of the trial and appellate proceedings would

10   have been different had counsel pointed out that Cornacchia did not test the swabs

11   prior to the preliminary hearing but had done so by the time of trial.

12   Watkins also claims that counsel's decision not to introduce evidence of a letter

13   sent by Detective Tomsovic to the crime lab prejudiced his defense.  Specifically,

14   Watkins argues that this information, viewed in light of Cornacchia's allegedly perjured

15   testimony, would have led the jury to believe that the crime lab fabricated evidence.[5]

16   (*Pet.* at 17–18.) However, Watkins provides no supporting evidence to establish that

17   the proceedings' results would have been different had counsel introduced the letter

18   into evidence.  On the other hand, the prosecution introduced significant evidence

19   tying Watkins to the crime, including his fingerprints and jacket found at the scene and

20   Brown's blood on Watkins's boxer shorts.  For counsel's failure to introduce the letter

21   to prejudice Watkins's defense, the jury would have had to believe that the crime lab

22   fabricated all of this evidence in response to Tomsovic's letter.  The Court finds it

23   highly unlikely that the bias allegedly exposed by the letter would have led the jury to

24   disbelieve all of the scientific evidence supporting the conclusion reached at trial.

25   Finally, Watkins argues that he was prejudiced by trial counsel's decision to move

26   to exclude evidence of unidentified female blood found on Watkins's shoes. (*Lodgment*

27

28   [5] Detective Tomsovic's letter indicated: "We need to find traces of Brown (i.e., blood, etc.) [on Watkins's] clothing, or traces of Watkins (i.e., semen, hair, skin, etc.) on or in Brown as a first priority." (*Lodgment 1*, vol. 1 at 7.)

1  *1*, vol. 2 at 333–34.)   However, Watkins fails to indicate how counsel performed
2  deficiently under the "highly deferential" standard of review afforded to counsel's
3  decisions.  Strickland, 466 U.S. at 689.  As the California Court of Appeal correctly
4  pointed out, this unidentified blood evidence could have led the jury to rationally
5  believe that Watkins had committed additional violent crimes.  (*Lodgment 11* at 3.)
6  Accordingly, trial counsel made a perfectly reasonable decision to seek to exclude this
7  evidence.  Regardless of whether counsel's decision was reasonable, Watkins fails to
8  indicate how—but for counsel's decision to exclude this evidence—his trial or appeal
9  would have resulted in acquittal or reversal.  As Respondent points out, even if the
10  unidentified blood led the jury to believe that a third person had committed the actual
11  murder, Watkins could still have been convicted of first-degree special circumstances
12  felony murder on an aiding and abetting theory.  See Cal. Penal Code § 31 (holding
13  individuals who aid or abet the commission of an offense liable as principals); see also
14  People v. Prettyman, 926 P.2d 1013, 1018 (Cal. 1996) ("Under California law, a person
15  who aids and abets the commission of a crime is a 'principal' in the crime, and thus
16  shares the guilt of the actual perpetrator.").

17      The California Court of Appeal's decision denying this claim is the last reasoned
18  state court decision on this issue.  (*Lodgment 11* at 2–3.)  The court held that Watkins
19  failed to establish how counsel's allegedly ineffective assistance prejudiced his defense.
20  This Court is not called to decide whether it agrees with the state court's decision or
21  whether it would have reached the same conclusion; rather, the Court inquires only
22  whether the state court's decision was objectively unreasonable.  Yarborough, 540 U.S.
23  at 5.   Because Watkins fails to demonstrate how counsel's allegedly ineffective
24  assistance prejudiced his defense, the Court finds that the California Court of Appeal's
25  denial of this claim was neither contrary to, nor an unreasonable application of, clearly
26  established Supreme Court law. Williams, 529 U.S. at 412–13. Accordingly, the Court
27  **ADOPTS** the Report, **OVERRULES** Watkins's Objections, and **DENIES** Watkins's
28  ineffective assistance of counsel claim.

07cv0196W

1

2   C.   THE TOTALITY OF THE CIRCUMSTANCES SURROUNDING THE
3        PEREMPTORY EXCUSES OF AFRICAN-AMERICAN JURORS DOES NOT
4        ESTABLISH A PRIMA FACIE CASE OF RACIAL DISCRIMINATION

5       Watkins contends that the prosecutor excluded African-American jurors from
6   the jury on the basis of race in violation of the Equal Protection Clause of the
7   Fourteenth Amendment. (*Pet.* at 21–22.) The Magistrate Judge reviewed the voir dire
8   transcripts and concluded that, although Watkins satisfied the first two elements of a
9   prima facie case, the totality of the circumstances did not give rise to an inference of
10  racial discrimination. (*Report* at 19.) Watkins's Objections regarding this claim consist
11  of a photocopy of the corresponding pages from his original Petition, with only minor
12  editorial changes. (See *Objections* at 16–17; *Pet.* at 21–22.)

13      The Equal Protection Clause forbids the exercise of peremptory challenges based
14  on race. Batson v. Kentucky, 476 U.S. 79, 89 (1986). Establishing a Batson violation
15  requires a three-step inquiry. Id. at 96–98. First, the defendant must establish a prima
16  facie case of racial discrimination. Id. at 96–98. "Once the defendant makes a prima
17  facie showing, the burden shifts to the State to come forward with a neutral explanation
18  for challenging black jurors." Id. at 97. The trial court must then decide whether to
19  accept or reject the state's proffered justification. Id. at 98.

20      The opponent of a peremptory strike establishes a prima facie case of racial
21  discrimination—and shifts the burden of explaining the strike to the prosecution—by
22  making three showings: (1) the defendant is a member of a "cognizable racial group;"
23  (2) the State used its peremptory strikes to exclude members of the defendant's racial
24  group from the jury; and (3) the totality of the circumstances give rise to an inference
25  of impermissible discrimination. Id. If the defendant fails to establish a prima facie case
26  of discrimination, the inquiry ends. J.E.B. v. Alabama, 511 U.S. 127, 145–46 (1994)
27  (citing Batson, 476 U.S. at 97). A review on habeas of the trial court's determination
28  as to whether the defendant established a prima facie case of racial discrimination is

1   entitled to a presumption of correctness.  Tolbert v. Paige, 182 F.3d 677, 685 (9th Cir.

2   1999).

3          Here, Watkins's Batson claim falls short.  When the prosecutor excused the only

4   two African-American potential jurors, defense counsel made a Batson motion, arguing

5   that the excused jurors belonged to a cognizable racial group, that Watkins was a

6   member of that racial group, and that the circumstances raised an inference of

7   discrimination.  (Lodgment 4, vol. 4 at 907.)  Upon reviewing the potential jurors'

8   questionnaires, however, the trial judge concluded that the totality of the circumstances

9   failed to establish a prima facie case of discrimination.  (Lodgment 1, vol. 3 at 557–58.)

10  After reviewing the voir dire transcripts, this Court must defer to the trial court's

11  analysis.  Tolbert, 182 F.3d at 685.  Although both excused jurors were members of a

12  cognizable racial group to which Watkins also belonged, the circumstances do not give

13  rise to an inference of racial discrimination.  The first excused juror seemed confused

14  by the court's voir dire questioning and gave little meaningful indication of his views on

15  the death penalty.  (Lodgment 1, vol. 1 at 242–45.)  The prosecutor could have

16  determined that he was unable to sufficiently gauge this juror's position on the death

17  penalty and his ability to objectively assess the prosecution's case.

18         The second excused juror stated during voir dire that he did not wish to serve on

19  the jury, and he objected to the random jury summons process.  (Lodgment 4, vol. 4 at

20  667–68.)  He also expressed some negative feelings about law enforcement.  (Id. at

21  688–89, 693.)  The prosecutor could have concluded from this juror's voir dire

22  responses that the juror would be more favorable to the defense.  Accordingly, the

23  circumstances surrounding the peremptory excuses of these jurors support the

24  conclusion that the prosecutor excused these jurors on legitimate, non-discriminatory

25  grounds.

26         The California Court of Appeal's decision denying this claim is the last reasoned

27  state court decision on this issue.  (Lodgment 11 at 4.)  The court held that Watkins

28  failed to allege facts "showing the prosecution engaged in discriminatory conduct in the

1  jury selection process." (*Id.*)  This Court is not called to decide whether it agrees with
2  the state court's decision or whether it would have reached the same conclusion; rather,
3  the Court inquires only whether the state court's decision was objectively unreasonable.
4  Yarborough, 540 U.S. at 5.  The totality of the circumstances surrounding the
5  peremptory excuses of the two African-American potential jurors supports the trial
6  court's conclusion that the prosecutor excused the potential jurors based on their voir
7  dire responses, rather than their race.  In light of the deferential standard of review
8  afforded to the trial court's factual determination of Batson issues, the Court cannot
9  conclude that the California Court of Appeal's denial of this claim was contrary to, or
10  an unreasonable application of, clearly established Supreme Court law.  Williams, 529
11  U.S. at 412–13.  Accordingly, the Court **ADOPTS** the Report, **OVERRULES**
12  Watkins's Objections, and **DENIES** Watkins's Batson claim.

13

14      D.    THE EVIDENCE PRESENTED AT TRIAL DID NOT WARRANT A JURY
15          INSTRUCTION ON INTOXICATION, AND THE INSTRUCTION ON
16          SPECIAL CIRCUMSTANCES FELONY MURDER, WHILE INCOMPLETE, DID
17          NOT VIOLATE DUE PROCESS

18      Watkins asserts that the trial court violated his Fourteenth Amendment right to
19  due process by failing to instruct the jury on voluntary intoxication and involuntary
20  manslaughter, and by erroneously failing to include the second paragraph of CALJIC
21  No. 8.81.17.  (*Pet.* at 23–25.)  After reviewing the record, the Magistrate Judge
22  concluded that there was insufficient evidence of intoxication to warrant a voluntary
23  intoxication instruction, and the evidence presented did not support an involuntary
24  manslaughter instruction. (*Report* at 22–24.)  Additionally, the Magistrate Judge
25  concluded that the jury instructions on special circumstances felony murder, while
26  incomplete, adequately described the requisite elements of the offense. (*Id.* at 25–27.)
27  In his Objections, Watkins asserts that sufficient circumstantial evidence existed to
28  warrant voluntary intoxication and involuntary manslaughter instructions. (*Objections*

at 18–29.)  Regarding CALJIC No. 8.81.17, Watkins argues that the trial court's failure to include the instruction's second paragraph violated due process.  (*Objections* at 30.)

In order for an erroneous jury instruction to support reversal on collateral review, the allegedly defective instruction must have "so infected the entire trial that the resulting conviction violates due process."  Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  "The fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief."  Estelle v. McGuire, 502 U.S. 62, 71–72 (1991).  Moreover, the instruction must be viewed in the context of the instruction and the trial record as a whole.  Id. at 72 (citing Cupp, 414 U.S. at 147).

### 1.   *Voluntary Intoxication And Involuntary Manslaughter*

In considering an alleged failure to instruct on a defense theory, the Ninth Circuit has held that "[f]ailure to instruct on the defense theory of the case is reversible error if the theory is legally sound and evidence in the case makes it applicable."  Clark v. Brown, 450 F.3d 898, 904–05 (9th Cir. 2006) (quoting Beardslee v. Woodford, 358 F.3d 560, 577 (9th Cir. 2004)).  However, "due process requires that a lesser included offense be given *only* when the evidence warrants such an instruction."  Hopper v. Evans, 456 U.S. 605, 611 (1982) (emphasis in original).

### a.   Voluntary Intoxication

Voluntary intoxication does not act as an excuse to homicide.  People v. Boyer, 133 P.3d 581, 662 (Cal. 2006).  "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought."  Cal. Penal Code § 22(b).  California law requires that a trial court give a jury instruction on voluntary intoxication "only when there is *substantial* evidence of the defendant's voluntary intoxication *and* the

1   intoxication affected the defendant's actual formation of specific intent." People v.

2   Williams, 941 P.2d 757, 777 (Cal. 1997) (emphasis added) (internal quotation marks

3   omitted).

4         Watkins contends that the testimony of Dr. Alan Abrams ("Dr. Abrams")

5   constitutes sufficient evidence to warrant a jury instruction on voluntary intoxication

6   and involuntary manslaughter. (Objections at 18–29.) However, Dr. Abrams testified

7   that, although cocaine metabolites and PCP were found in Watkins's urine sample

8   taken at the time of his interrogation, he could not say with certainty whether Watkins

9   was intoxicated at the time of Brown's murder. (Lodgment 1, vol. 10 at 2028–33.) From

10   the narcotics levels present in Watkins's urine, Dr. Abrams could only conclude that

11   Watkins ingested "a fair amount of cocaine within 24 hours, 48 hours, [or] 72 hours."

12   (Id. at 2031.) Furthermore, Sylvia Castro and Latesha Johnson, who saw Watkins on

13   the evening of the murder, testified that Watkins did not appear intoxicated.

14   (Lodgment 1, vol. 4 at 743; Lodgment 1, vol. 5 at 967.)

15         Watkins attempts to explain away Castro's and Johnson's testimony by offering

16   the testimony of Sarita Santana, the mother of Watkins's child, who testified that

17   Watkins "always had a calm demeanor," even when he used cocaine. (Lodgment 1, vol.

18   5 at 1301–02.) However, this testimony simply is not dispositive with respect to

19   whether Watkins was intoxicated at the time of Brown's murder. Because no evidence

20   exists suggesting that Watkins was under the influence of alcohol or narcotics when he

21   killed Brown, the trial court correctly denied Watkins's request to instruct the jury on

22   the effect of voluntary intoxication on specific intent.[6] Even assuming Watkins was

23   intoxicated at the time of the murder, he fails to produce any evidence demonstrating

24   that his intoxication negated the specific intent necessary for first-degree murder. See

25   ────────────

26      [6] Watkins objects to the Magistrate Judge's Report concluding that insufficient evidence
existed to support a jury instruction on voluntary intoxication. (Objections at 18-29.) Watkins
relies primarily on the fact that voluntary intoxication "was essentially his only defense." (Id.

27   at 19.) However, Watkins fails to direct the Court to any substantial evidence in the record
warranting such an instruction. In the absence of sufficient evidence to support the giving of

28   the instruction, the trial court did not err by declining to do so. Hopper, 456 U.S. at 611;
Williams, 941 P.2d at 777.

1  <u>Williams</u>, 941 P.2d at 777 ("A defendant is entitled to [a voluntary intoxication]

2  instruction only when there is substantial evidence of the defendant's voluntary

3  intoxication *and the intoxication affected the defendant's actual formation of specific intent.*"

4  (emphasis added) (internal quotation marks ommitted)).

5

6                    **b.      Involuntary Manslaughter**

7         Involuntary manslaughter is defined as "the unlawful killing of a human being

8  without malice . . . in the commission of an unlawful act, not amounting to a felony; or

9  in the commission of a lawful act which might produce death, in an unlawful manner,

10  or without due caution and circumspection." Cal. Penal Code § 192(b).  Consistent

11  with <u>Hopper</u>, California law requires a lesser included offense instruction only where

12  substantial evidence exists to support the theory mandating that instruction.  <u>People</u>

13  <u>v. Breverman</u>, 960 P.2d 1094, 1106 (Cal. 1998).   In the context of voluntary

14  intoxication, a jury instruction on involuntary manslaughter is proper where evidence

15  of the defendant's intoxication negates malice aforethought. <u>People v. Halvorsen</u>, 165

16  P.3d 537 (Cal. 2007).

17         As discussed above, no evidence exists to support the conclusion that Watkins

18  was intoxicated at the time of Brown's murder. Thus, no evidence exists to suggest that

19  Watkins could not form the malice aforethought necessary for first-degree murder.

20  Moreover, Brown's death did not occur during "the commission of an unlawful act, not

21  amounting to a felony; or in the commission of a lawful act which might produce death

22  . . . without due caution and circumspection." Cal. Penal Code § 192(b).   The

23  information charged Watkins with burglary and robbery, both felonies.  (*Lodgment 2*,

24  vol. 1 at 14–17.)  Accordingly, the California Court of Appeal's denial of this claim was

25  neither contrary to, nor an unreasonable application of, clearly established Supreme

26  Court law. <u>Williams</u>, 529 U.S. at 412–13.

27

28

07cv0196W

1                 2.     *Special Circumstances Felony Murder*

2        Watkins contends that the erroneous omission of the second paragraph of

3 CALJIC No. 8.81.17 deprived him of due process because the resulting instruction did

4 not require the jury to find that he committed the murder to carry out or advance the

5 burglary and robbery. (*Objections* at 30.) The court instructed the jury on the elements

6 of first-degree felony murder. (*Lodgment 2*, vol. 3 at 662.) If the jury concluded that

7 Watkins committed first-degree felony murder, the instructions required the jury to find

8 that the murder was committed during the commission of a robbery or burglary to find

9 the special circumstance allegation true. (*Id.* at 665–68.) The jury was instructed that

10 "[t]o prove the robbery special circumstance, the People must prove that the defendant

11 committed the robbery for a purpose other than merely to facilitate or conceal the

12 murder." (*Id.* at 669.) An identical instruction was given substituting the word

13 "burglary" for "robbery." (*Id.* at 670.)

14        A felony murder special circumstance exists where "[t]he murder was committed

15 while the defendant was engaged in . . . the commission of, attempted commission of,

16 or the immediate flight after committing, or attempting to commit" a variety of

17 enumerated felonies, including robbery or residential burglary. Cal. Penal Code §

18 190.2(a)(17)(A), (G). Under California law, a felony murder special circumstance

19 "may be alleged when the murder occurs during the commission of the felony, [but] not

20 when the felony occurs during the commission of a murder." People v. Mendoza, 6 P.3d

21 150, 182 (Cal. 2000). Thus, the prosecution must demonstrate that the defendant had

22 the "independent purpose" to commit the underlying felony, not merely that the

23 commission of the felony was incidental to the commission of the murder. Id.

24        The omitted paragraph of CALJIC No. 8.81.17 requires a finding that "[t]he

25 murder was committed in order to carry out or advance the commission of the crime,"

26 and states that "the special circumstance is not established if the [crime] was merely

27 incidental to the commission of the murder." CALJIC No. 8.81.17. The California

28 Supreme Court has held that "there is nothing magical about the phrase 'to carry out

1  or advance' the felony" in CALJIC No. 8.81.17. <u>People v. Horning</u>, 102 P.3d 228, 253
2  (Cal. 2004). This requirement may be conveyed using "independent purpose" language.
3  <u>Id.</u> at 253 & n.8 (citing <u>Mendoza</u>, 6 P.3d at 182; <u>People v. Bonin</u>, 765 P.2d 460, 485
4  (Cal. 1989)).

5       The jury instructions in Watkins's case required the jury to find that Watkins
6  "committed the robbery for a purpose other than merely to facilitate or conceal the
7  murder," and that he "had a purpose to commit the felony of robbery [or burglary]
8  independent of the murder." (*Lodgment 2*, vol.3 at 669–70.) Accordingly, when read
9  as a whole per <u>Estelle</u>, 502 U.S. at 72, the instructions adequately convey the
10  requirement of CALJIC No. 8.81.17 that the underlying felony must be independent
11  of—and not "merely incidental" to—the murder.

12       The California Court of Appeal's decision denying this claim on direct appeal is
13  the last reasoned state court decision on this issue. (*Lodgment 7* at 11–16.) The court
14  held that insufficient evidence existed to warrant intoxication-related instructions. (*Id.*
15  at 11–14.) The court also held that the jury instructions adequately conveyed special-
16  circumstances-felony-murder's independent purpose requirement by requiring the jury
17  to find that the purpose to commit the underlying felony was independent of the
18  purpose to commit the murder. (*Id.* at 14–16.) This Court is not called to decide
19  whether it agrees with the state court's decision or whether it would have reached the
20  same conclusion; rather, the Court inquires only whether the state court's decision was
21  objectively unreasonable. <u>Yarborough</u>, 540 U.S. at 5. Based on the record, the Court
22  finds Petitioner has failed to show that the state court's determination was objectively
23  unreasonable.    Accordingly, the Court **OVERRULES** Petitioner's Objections,
24  **ADOPTS** the Report, and **DENIES** Petitioner's due process claim.
25  ///
26  ///
27  ///
28  ///

1  E.   WATKINS KNOWINGLY AND VOLUNTARILY WAIVED HIS MIRANDA

2       RIGHTS, AND HIS POST-MIRANDA STATEMENTS WERE NOT TAINTED

3       BY COERCION

4        Watkins's final two claims concern the interrogation following his arrest. First,

5  Watkins claims that he did not knowingly and voluntarily waive his Miranda rights.

6  (Pet. at 25–26.) Second, Watkins claims that the trial court should have suppressed his

7  post-Miranda statements as involuntary. (Id. at 26–28.) Respondent contends that

8  Watkins failed to exhaust these claims, because he did not present them to the

9  California Supreme Court in his direct appeal or to any state court in a habeas corpus

10 petition. (Resp't's Mem. at 27.) Alternatively, Respondent contends that the Court of

11 Appeal's denial of these claims was neither contrary to, nor an unreasonable application

12 of, clearly established Supreme Court law. (Id. at 27–32.)

13       The Magistrate Judge ordered Respondent to file a motion to dismiss any claims

14 which the Court could address without reaching the merits. (Order Reopening Case and

15 Setting Briefing Schedule at 2.) Contrary to the Magistrate Judge's order, Respondent did

16 not file a motion to dismiss Watkins's Miranda claims as unexhausted. Accordingly, the

17 Court will address the merits of Watkins's Miranda claims pursuant to 28 U.S.C.

18 § 2254(b)(2), which provides that "[a]n application for writ of habeas corpus may be

19 denied on the merits, notwithstanding the failure of the applicant to exhaust the

20 remedies available in the courts of the State." See also Cassett v. Stewart, 406 F.3d

21 614, 623 (9th Cir. 2004) ("[A] federal court may deny an unexhausted claim on the

22 merits where 'it is perfectly clear that the applicant does not raise even a colorable

23 federal claim.'" (quoting Granberry v. Greer, 481 U.S. 129, 135 (1987))).

24

25       1.   Knowing And Voluntary Miranda Waiver

26       Watkins argues that he did not knowingly and voluntarily waive his Miranda

27 rights because Detective Hergenroeather questioned him briefly before giving him a

28 Miranda advisement and trivialized the advisement by referring to it as the "[o]l' Jack

- 20 -

1    Webb thing." (*Pet.* at 25–26; *Petr.'s Ex.* C.)  The trial court suppressed all of Watkins's

2    statements prior to receiving the Miranda advisement. (*Lodgment 1*, vol. 1 at 268–75.)

3    The court also suppressed all of Watkins's statements following his request to speak

4    with counsel.   (*Id.*)   Watkins argues that the pre-advisement questioning and the

5    statement trivializing the advisement rendered any subsequent Miranda waiver invalid.

6    (*Pet.* at 25–26; *Petr.'s Ex.* C.)

7            Clearly established Supreme Court law prohibits the prosecution from using

8    statements made by the defendant during custodial interrogation unless the defendant

9    is advised of his right to remain silent and his right to the presence of counsel. Miranda

10   v. Arizona, 384 U.S. 436, 444 (1966).  The defendant may waive these rights, but any

11   waiver must be voluntary, knowing, and intelligent.   Id.   The Supreme Court

12   enunciated the standard by which courts must judge the validity of any waiver in Moran

13   v. Burbine, 475 U.S. 412, 421 (1986):

14       First, the relinquishment of the right must have been voluntary in the sense that
         it was the product of a free and deliberate choice rather than intimidation,
15       coercion, or deception.  Second, the waiver must have been made with a full
         awareness of both the nature of the right being abandoned and the consequences
16       of the decision to abandon it.  Only if the "totality of the circumstances
         surrounding the interrogation" reveal both an uncoerced choice and the requisite
17       level of comprehension may a court properly conclude that the Miranda rights
         have been waived.
18

19   (quoting Fare v. Michael C., 442 U.S. 707, 725 (1979)).

20           In Oregon v. Elstad, 470 U.S. 298, 300 (1985), Sheriff's officers investigating a

21   residential burglary received information implicating Elstad, the burglary victims'

22   eighteen-year-old neighbor.  When officers arrived at Elstad's residence with an arrest

23   warrant, one officer sat down with Elstad in the living room and asked Elstad if he knew

24   why the officers wanted to speak with him and whether he knew the victims.  Id. at

25   301. Elstad responded that he knew the victims and added that he had heard that the

26   victims' house had recently been burglarized.  Id.  The officer indicated that he

27   suspected that Elstad had participated in the burglary, and Elstad responded he was

28   there. Id.

1    The officers then transported Elstad to the Sheriff's headquarters and advised

2    him of his <u>Miranda</u> rights.  <u>Id.</u>  Elstad subsequently gave a full statement in which he

3    admitted to being involved in the burglary.  <u>Id.</u>  At trial, Elstad argued that his post-

4    <u>Miranda</u>-advisement statement should be suppressed because the pre-advisement

5    questioning "let the cat out of the bag," tainting any subsequent statements.  <u>Id.</u> at 302.

6    The Supreme Court refused to adopt a categorical rule invalidating any waiver

7    following unwarned questioning; rather, the Court stated that the relevant inquiry with

8    respect to any post-advisement statement focused "solely on whether it [was] knowingly

9    and voluntarily made."  <u>Id.</u> at 309.  The Court noted that "[n]either the environment

10   nor the manner" of the officer's initial questioning of Elstad was coercive.  <u>Id.</u> at 315.

11   The Court concluded "that a suspect who has once responded to unwarned yet

12   uncoercive questioning is not thereby disabled from waiving his rights and confessing

13   after he has been given the requisite <u>Miranda</u> warnings."  <u>Id.</u> at 318.

14       In <u>Missouri v. Seibert</u>, 542 U.S. 600, 604 (2004), the respondent's twelve-year-

15   old son Jonathan died in his sleep, presumably as a result of complications associated

16   with the boy's cerebral palsy.  Fearing charges of neglect, Seibert and her other sons

17   planned to conceal the circumstances surrounding Jonathan's death by burning the

18   mobile home in which the family lived.  <u>Id.</u>  In order to make it appear that the family

19   had not left Jonathan alone, Seibert and her sons planned to leave a mentally-ill

20   teenager behind in the mobile home.  <u>Id.</u>  Seibert's son Darian set the fire, which killed

21   the teenager.  <u>Id.</u>

22       Five days later, police arrested Seibert at a hospital where Darian was being

23   treated for burns he received starting the fire.  <u>Id.</u>  The officer who arrested Seibert,

24   acting on specific instructions, did not give Seibert a <u>Miranda</u> advisement.  <u>Id.</u>  After

25   Seibert arrived at the police station, an officer questioned her for thirty to forty minutes,

26   eventually obtaining a confession.  <u>Id.</u> at 604–05.  After conducting the initial

27   interrogation, the officer gave Seibert a cigarette break.  <u>Id.</u>  When Seibert returned,

28   the officer advised her of her <u>Miranda</u> rights, obtained a signed waiver, and questioned

1    her again, this time obtaining a tape-recorded confession. Id. At trial, Seibert moved

2    to suppress both her pre-advisement and post-advisement statements. Id. The

3    arresting officer testified that he consciously withheld the Miranda advisement. Id. at

4    605–06. The Supreme Court held that "when Miranda warnings are inserted in the

5    midst of coordinated and continuing interrogation, they are likely to mislead and

6    'depriv[e] a defendant of knowledge essential to his ability to understand the nature of

7    his rights and the consequences of abandoning them.'" Id. at 613–14 (quoting Moran,

8    475 U.S. at 424); see also United States v. Williams, 435 F.3d 1148, 1157 (9th Cir.

9    2006) ("[A] trial court must suppress postwarning confessions obtained during a

10   deliberate two-step interrogation where the midstream Miranda warning—in light of the

11   objective facts and circumstances—did not effectively apprise the suspect of his rights.")

12   (emphasis added).

13          Considering the totality of the circumstances, the Court concludes that

14   Watkins's interrogation falls more closely on the continuum to Elstad than it does to

15   Siebert. The environment in which Watkins's initial pre-advisement interrogation took

16   place—a police station—was not as innocuous as the suspect's living room in Elstad.

17   However, Detective Hergenroeather's questioning resembled that which took place in

18   Elstad.   Hergenroeather began the interview by asking Watkins several general

19   background questions. (Lodgment 5 at 2–4.) Hergenroeather then told Watkins that

20   he wanted to talk to Watkins about a warrant, and about Watkins's whereabouts on the

21   evening of October 20, 2001. (Id. at 4.) Hergenroeather also asked Watkins about

22   jewelry, "because other people [said] that maybe [Watkins] could've had some jewelry."

23   (Id.) After Watkins denied having any jewelry, Hergenroeather told Watkins that he

24   had "to do the ol[]' Jack Web[b] thing" and advised Watkins of his Miranda rights. (Id.

25   at 5.)

26          While this type of interrogation is decidedly more investigative than that at issue

27   in Elstad, it certainly does not rise to the level of "coercive" questioning, which would

28   disable Watkins from waiving his rights. At no point before the Miranda advisement

1  did Detective Hergenroeather directly question Watkins regarding his involvement in

2  the murder, and Hergenroeather's questioning did not prompt any incriminating

3  statements. (See Lodgment 5 at 2–5.) Nor did Hergenroeather deliberately insert the

4  Miranda warning "in the midst of coordinated and continuing interrogation." Seibert,

5  542 U.S. at 613; Williams, 435 F.3d at 1157. Accordingly, the Court cannot conclude

6  that the California Court of Appeal's finding that neither the "Jack Webb" comment

7  nor the pre-advisement questioning tainted the post-advisement statement was contrary

8  to, or an unreasonable application of, clearly established Supreme Court law. Williams,

9  529 U.S. at 412–13.

10

11      2.    *Implied* Miranda *Waiver*

12      Watkins also argues that his failure to give an express Miranda waiver rendered

13  any purported waiver invalid. (Pet. at 25–26; Petr.'s Ex. C.) Specifically, Watkins

14  contends that "it is troubling that an individual with brain damage, with an I.Q. of 69,

15  with a blood-alcohol level of .2, not to mention with cocaine and [PCP] in his system,"

16  could be found to have impliedly waived his Miranda rights. (Pet. at 26.) After viewing

17  the videotape and considering Watkins's interrogation transcript, the trial court

18  concluded that there was "nothing in Watkins's demeanor or conduct [to suggest] that

19  he was so incapacitated or incompetent as to be unable to knowingly and intelligently

20  waive his rights." (Lodgment 7 at 8.)

21      Clearly established Supreme Court law holds that a suspect's express Miranda

22  waiver "is not inevitably either necessary or sufficient to establish waiver." North

23  Carolina v. Butler, 441 U.S. 369, 373 (1979). Instead, the question is "whether the

24  defendant in fact knowingly and voluntarily waived" his Miranda rights. Id. "[I]n at

25  least some cases waiver can be inferred from the actions and words of the person

26  interrogated." Id.; see also United States v. Rodriguez-Preciado, 399 F.3d 1118, 1127

27  (9th Cir. 2005) ("Waivers of Miranda rights need not be explicit; a suspect may

28  impliedly waive the rights by answering an officer's questions after receiving Miranda

1  warnings." (citing <u>Terrovona v. Kincheloe</u>, 912 F.2d 1176, 1179–80 (9th Cir. 1990))).

2  "[T]he question of waiver must be determined on 'the particular facts and

3  circumstances surrounding [the] case, including the background, experience, and

4  conduct of the accused.'" <u>Butler</u>, 441 U.S. at 374–75 (quoting <u>Johnson v. Zerbst</u>, 304

5  U.S. 458, 464 (1938)).

6      The circumstances of Watkins's interrogation support the state court's finding

7  that Watkins implicitly waived his <u>Miranda</u> rights.   After receiving his <u>Miranda</u>

8  advisement, Watkins explicitly stated that he understood his rights.  (*Lodgment 5* at 5.)

9  Watkins then continued to respond to Detective Hergenroeather's questions.  (<u>See</u> *Id.*

10  at 5–60.)   Watkins requested to speak with an attorney near the end of the

11  interrogation, lending further support to the conclusion that he understood the nature

12  of—and had previously waived—his <u>Miranda</u> rights.  (*Id.* at 60); <u>see</u> <u>Terrovona</u>, 912

13  F.2d at 1180 (holding that suspect's demonstrated ability to assert constitutional right

14  to an attorney militated in favor of finding of knowing and voluntary waiver).

15     After independently reviewing the record, the California Court of Appeal

16  affirmed the trial court's finding that Watkins implicitly waived his <u>Miranda</u> rights by

17  continuing to respond to Detective Hergenroeather's questions following the

18  advisement. (*Lodgment 7* at 8–9.) This Court finds nothing in the record to undermine

19  the state court's conclusion that Watkins knowingly and voluntarily waived his rights

20  by continuing to respond to post-advisement questions.[7]  Accordingly, the California

21  Court of Appeal's denial of this claim was neither contrary to, nor an unreasonable

22  application of, clearly established Supreme Court law. <u>Williams</u>, 529 U.S. at 412–413.

23

24  ───────────

[7] Watkins also argues that his intoxication during the interview should render his <u>Miranda</u> waiver invalid. (*Pet.* at 25–26.) However, the ingestion of alcohol or drugs does not
25  automatically render a waiver invalid.  <u>Nelson v. McCarthy</u>, 637 F.2d 1291, 1295 (1980). Upon reviewing the videotape and considering the transcript of the interrogation, both the trial
26  court and the appellate court concluded that Watkins's intoxication was not so gross as to render him unable to understand his <u>Miranda</u> rights.  (*Lodgment 1*, vol. 1 at 272; *Lodgment 7*
27  at 8–9.)  The trial court's determination that Watkins's voluntarily waived his <u>Miranda</u> rights carries a presumption of correctness under 28 U.S.C. § 2254(e)(1).  <u>Nelson</u>, 637 F.2d at
28  1295–96.  Watkins's claim is deficient in this regard, because it fails to direct the Court to any clear and convincing evidence to contradict the trial court's determination.  <u>Id.</u>

1
2          **3.     *Admission Of Watkins's Post-Advisement Statements***

3          Watkins also argues that the trial court should have suppressed his post-
4  advisement statements as involuntary. (*Pet.* at 26-27.) Specifically, he contends that,
5  even if "the initial <u>Miranda</u> violation did not render the Mirandized portion of the
6  interrogation inadmissible as a matter of law, that portion was nevertheless
7  inadmissible, inasmuch as [Watkins's] statements there were involuntarily given."
8  (*Petr.'s Ex. D* at 59 n.13.)

9          The Fifth Amendment forbids the use of an involuntary confession against a
10 defendant. <u>Jackson v. Denno</u>, 378 U.S. 368, 385–86 (1964). However, "coercive police
11 activity is a necessary predicate to the finding that a confession is not 'voluntary.'"
12 <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986). "[W]hether the confession was
13 obtained by coercion or improper inducement can be determined only by an
14 examination of all of the attendant circumstances." <u>Haynes v. Washington</u>, 373 U.S.
15 503, 513 (1963). Specifically, a court must consider "whether 'the government
16 obtained the statement by physical or psychological coercion or by improper
17 inducement so that the suspect's will was overborne.'" <u>Beaty v. Stewart</u>, 303 F.3d 975,
18 992 (9th Cir. 2002) (quoting <u>United States v. Guerrero</u>, 847 F.2d 1363 (9th Cir.
19 1988)); <u>see</u> <u>also</u> <u>Hutto v. Ross</u>, 429 U.S. 28, 30 (1976) (per curiam) ("The test is
20 whether the confession was 'extracted by any sort of threats or violence, [or] obtained
21 by any direct or implied promises, however slight, [or] by the exertion of any improper
22 influence.'" (citing <u>Bram v. United States</u>, 168 U.S. 532, 542–43 (1897) (alterations in
23 original))).

24         Although Detectives Hergenroeather and Ott told Watkins during the
25 interrogation that it would be "alright" and "fine" if he admitted to having jewelry, the
26 detectives never explicitly or implicitly promised Watkins any leniency in exchange for
27 his statement. (*Lodgment 5* at 16, 36.) Nor did the detectives use any threats of
28 violence or undue influence in extracting Watkins's statement. (<u>See</u> *id.*) The

1 detectives conducted the relatively short interrogation in a relaxed manner and did not

2 deprive Watkins of food, water, or access to a restroom. (*See id.* at 14 ¶ 19–20 ("[John

3 Hergenroeather]: Want some water? [David Watkins]: Yeah."); *id.* at 52 ¶ 7–10 .) In

4 short, Detectives Hergenroeather and Ott did not engage in any "coercive police

5 activity" that would render Watkins's statement involuntary.

6         The California Court of Appeal's decision denying this claim on direct appeal is

7 the last reasoned state court decision on this issue. (*Lodgment 7* at 11–16.) The

8 appellate court held that Watkins's implied <u>Miranda</u> waiver was knowing and

9 voluntary, and that Watkins's statements following the <u>Miranda</u> advisement were given

10 voluntarily. (*Lodgment 7* at 7–10.) This Court is not called to decide whether it agrees

11 with the state court's decision or whether it would have reached the same conclusion;

12 rather, the Court inquires only whether the state court's decision was objectively

13 unreasonable. <u>Yarborough</u>, 540 U.S. at 5. Based on the record, the Court finds

14 Petitioner has failed to show that the state court's determination was objectively

15 unreasonable. Accordingly, the Court **OVERRULES** Petitioner's Objections,

16 **ADOPTS** the Report, and **DENIES** Petitioner's <u>Miranda</u> claim.

17 ///

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

07cv0196W

1   IV.   CONCLUSION AND ORDER

2          In light of the foregoing, the Court **ADOPTS** the reasoning and findings

3   contained in the Report and **OVERRULES** Watkins's Objections.  For the reasons

4   stated in the Report, which is incorporated herein by reference, the Court **DENIES**

5   Watkins's § 2254 writ of habeas corpus.  The Clerk of the Court shall close the district

6   court file.

7          **IT IS SO ORDERED.**

8

9

10  DATE: June 19, 2008

11                                                   HON. THOMAS J. WHELAN
                                                     United States District Court
12                                                   Southern District of California

13  CC: All parties and counsel of record

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 28 -