FILED
AUG 13 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY            DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID DION WATKINS,<br><br>              Petitioner,<br>vs.<br><br>L.E. SCRIBNER, et al.,<br><br>              Respondents. | CASE NO. 07-CV-0196 W (POR)<br><br>ORDER DENYING APPLICATION FOR CERTIFICATE OF APPEALABILITY (Doc No. 30) |

On January 29, 2007, Petitioner David Dion Watkins ("Watkins" or "Petitioner"), a state prisoner proceeding *pro se*, commenced habeas corpus proceedings pursuant to 28 U.S.C. § 2254. (Doc. No. 1.) On April 4, 2008, United States Magistrate Judge Louisa S. Porter issued a Report and Recommendation ("Report") recommending that the Court deny Watkins's habeas request on the merits. (Doc. No. 24.) On April 22, 2008, Watkins timely filed Objections to the Report. (Doc. No. 26.) On June 19, 2008, the Court denied Watkins's habeas petition in its entirety. (Doc. No. 27.)

Pending before the Court is Watkins's Application for Certificate of Appealability ("COA"). (Doc. No. 30.) The Court decides the matter on the papers submitted and without oral argument. See S.D. Cal. Civ. R. 7.1.(d.1). For the reasons discussed below, the Court **DENIES** Petitioner's Application.

I.  **BACKGROUND**

The facts are undisputed and were set forth by the California Court of Appeal, Fourth District, Division One, in an unpublished opinion stating the following:

> On October 20, 2001, Watkins killed 82-year-old widow Lillie Mae Brown, for whom he had occasionally done odd jobs, by repeatedly stabbing and strangling her. Tsige Fesseha, who lived at Brown's home at the time, called the police after finding Brown's body on the floor of the master bedroom when she returned home from work early that evening. Although the responding officers found no sign of forced entry, the house was in disarray, with jewelry boxes and drawers ransacked and their contents spilled on the bed and the floors. The officers took fingerprints, later identified as Watkins's, from a bathroom counter and toilet, a jar, a telephone in the master bedroom and jewelry boxes in the house. They found a jacket, also belonging to Watkins, on the dining room floor.
>
> The next morning, a friend of Watkins told police that Watkins had tried to sell her some jewelry late the prior evening. Detectives James Hergenroeather and Michael Ott arrested Watkins on an outstanding misdemeanor warrant and took him to police headquarters for questioning. At the outset of the interview, which was audio and video taped, Watkins told the detectives that he had been drinking "a lot" of beer and had smoked crack cocaine shortly before his arrest. Before advising Watkins of his rights in accordance with Miranda v. Arizona, (1966) 384 U.S. 436 (Miranda), Detective Hergenroeather asked him whether he had been trying to sell some jewelry the night before. After Watkins denied having any jewelry, the officers told him that other people had told them the contrary.
>
> At that point, Detective Hergenroeather gave Watkins a Miranda advisement before continuing with the questioning. Watkins indicated that he understood his rights and Detective Hergenroeather asked whether he was willing to give "[h]is side of the story on this . . . jewelry thing." Watkins continued to talk to the officers, initially denying that he knew about or had any jewelry. He told them that he was one of a few people Brown would allow in her house and admitted that he had done some yard work for Brown and been in her home on the previous afternoon. He later indicated that a man known as "Cigarette Man" (a.k.a. James Lauderdale) had given him jewelry and a couple of clocks to sell and that he had sold some of the items for crack cocaine. He consistently maintained, however, that he did not kill Brown.
>
> Watkins volunteered to take the detectives to his girlfriend's apartment, where they recovered numerous pieces of jewelry, a clock and other items that had belonged to Brown. After the officers returned to the station with Watkins and recommenced questioning, Watkins made several requests to talk to a lawyer. Shortly thereafter (although not immediately), the officers stopped their interrogation. Several hours later, officers had Watkins's blood and urine tested for the presence of alcohol or drugs; the test results showed that Watkins had a blood alcohol level of .11 to .12 and had cocaine, phencyclidine (PCP) and metabolites in his system.

   The district attorney charged Watkins with murder, rape by foreign object, first degree robbery, willful cruelty to an elder resulting in great bodily injury or death and residential burglary. In connection with the murder count, the information alleged two special circumstances, that Watkins committed the murder while engaged in a robbery or while engaged in a burglary. As to certain other counts, it also alleged that Watkins had personally used a deadly weapon and had committed those crimes against an elderly person. The prosecutor elected to pursue the death penalty against Watkins.

   Prior to trial, the court granted Watkins's motion to suppress his statements made to police before being given the Miranda advisement and those he made after asking for an attorney. The court, however, also found that after being advised of his rights, Watkins knowingly and intentionally waived those rights and thus statements made thereafter (but before the request for an attorney) were admissible. At trial, the prosecutor introduced evidence of the events surrounding Brown's death. In his defense, Watkins introduced evidence that he had Brown's jewelry in the early afternoon of October 20, hours before Brown was killed, and that he was a nonviolent person. Watkins also introduced expert testimony that he had an IQ of 69 and suffered from brain impairment, perhaps resulting from long-term drug and alcohol use, that limited his ability to control his "short-range impulses." He requested that the trial court instruct the jury regarding the consequences of being intoxicated or under the influence of drugs, but the court declined to do so on the ground that there was not evidence to show that Watkins was in that condition at the time he committed the offense.

   The jury convicted Watkins of all counts other than rape with a foreign object and found true the special circumstance and remaining allegations. During the penalty phase, the jury recommended that the court sentence Watkins to life without the possibility of parole rather than death on the murder count. The court thereafter imposed the recommended sentence, plus an additional year for personal use of a deadly weapon, and stayed sentence on all remaining counts.

(Lodgment 7 at 2–5.) Watkins appealed his conviction to the California Court of Appeal, which upheld both his conviction and sentence. (See Lodgments 6, 7.) Watkins then filed a Petition for Review in the California Supreme Court, which that court denied. (See Lodgments 8, 9.)

   On January 9, 2006, Watkins sought habeas relief in San Diego County Superior Court, which the court denied in an unpublished written opinion. (See Lodgment 10.) Watkins then filed a habeas petition in the California Court of Appeal. (See Lodgment 11.) Again, the petition was denied. (Id.) Finally, Watkins filed a habeas petition in the California Supreme Court, which the court denied. (See Lodgment 12.)

On January 29, 2007, Watkins commenced these federal habeas corpus proceedings. (Doc. No. 1.) On June 19, 2008, the Court adopted the Magistrate Judge's Report and denied Watkins's habeas petition on the merits. (Doc. No. 27.) Watkins now moves for a COA. (Doc. No. 30.)

## II. LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), a state prisoner may not appeal the denial of a section 2254 habeas petition unless he obtains a COA from a district or circuit judge. 28 U.S.C. § 2253 (c)(1)(A); see also United States v. Asrar, 116 F.3d 1268, 1269-70 (9th Cir. 1997) (holding that district courts retain authority to issue COAs under the AEDPA).

In deciding whether to grant a COA, a court must either indicate the specific issues supporting a certificate or state reasons why a certificate is not warranted. Asrar, 116 F.3d at 1270. A court may issue a COA only if the applicant has made a "substantial showing" of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court has elaborated on the meaning of this requirement:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy section 2253(c) is straightforward: *The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.*

Slack v. McDaniel, 529 U.S. 473, 484 (2000) (emphasis added).

## III. DISCUSSION

Watkins argues that three issues warrant issuing a COA in this case: (1) whether Petitioner's Miranda waiver was voluntary, knowing, and intelligent; (2) whether the prosecution violated Petitioner's due process rights by excusing prospective African-American jurors; and (3) whether the trial court's refusal to instruct the jury regarding the effect of voluntary intoxication on specific intent violated Petitioner's due process

rights. (*Application for COA* [hereinafter "*Appl.*"] 3.) The Court will consider each issue in turn and concludes that Watkins has not made a substantial showing of a denial of any constitutional right.

### A.    Petitioner's *Miranda* Waiver was Voluntary, Knowing, and Intelligent

Petitioner contends that he was "under the influence of [a]lcohol, [c]ocaine, and P.C.P." during his custodial interrogation, thus rendering his waiver of his Miranda rights involuntary. (*Appl.* 4); see Miranda v. Arizona, 384 U.S. 436 (1966). Petitioner also directs the Court's attention to the trial court's suppression of Petitioner's pre-Miranda-advisement and post-request-for-counsel statements, and the trial court's statements regarding the "minimizing" of Petitioner's Miranda rights. (*Appl.* 4–5.) These are essentially the same arguments that Petitioner offered in his Petition and Objections.

The prosecution may not introduce evidence of statements made by the defendant during custodial interrogation unless the defendant is advised of his right to remain silent and his right to the presence of counsel. Miranda, 384 U.S. at 444. The defendant may choose to waive these rights. Id. However, any waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986).

The ingestion of alcohol or drugs does not automatically render a Miranda waiver invalid. Nelson v. McCarthy, 637 F.2d 1291, 1295 (9th Cir. 1980), abrogated on other grounds by Davis v. United States, 512 U.S. 452 (1994); see also Lambert v. Maass, No. 93-36055, 1994 WL 595175, at *5 (9th Cir. Oct. 27, 1994) ("A waiver is voluntary if it is 'the product of a rational intellect and a free will,' whether or not it is alcohol-induced." (quoting Medeiros v. Shimoda, 889 F.2d 819, 823 (9th Cir. 1989))). Factual issues relating to intoxication carry a presumption of correctness under 28

1  U.S.C. § 2254(e)(1), which a defendant may rebut only by clear and convincing
2  evidence. Nelson, 637 F.2d at 1296; see also Terrovona v. Kincheloe, 852 F.2d 424,
3  428 n.3 ("[S]ubsidiary fact questions related to a waiver (for example, whether
4  intoxication affected a waiver's voluntariness) are subject to the section [2254(e)(1)]
5  presumption.").

6  　　　　Both the trial court and California Court of Appeal reviewed the videotape and
7  transcript of Petitioner's custodial interrogation and concluded that Petitioner's
8  intoxication was not so gross as to render him unable to knowingly and voluntarily
9  waive his Miranda rights. (*Lodgment 1*, vol. 1 at 272; *Lodgment 7* at 8–9.) Petitioner
10 never produced any evidence to rebut the trial court's factual findings underlying the
11 conclusion that Petitioner "was not so mentally incapacitated as to be incapable of
12 exercising his free will." Lambert, 1994 WL 595175, at *5.

13 　　　　Furthermore, the fact that Petitioner did not expressly waive his Miranda rights
14 avails him naught. See United States v. Rodriguez-Preciado, 399 F.3d 1118, 1127 (9th
15 Cir. 2005) ("Waivers of Miranda rights need not be explicit; a suspect may impliedly
16 waive the rights by answering an officer's questions after receiving Miranda warnings.").
17 Finally, the trial court's suppression of Petitioner's pre-Miranda-advisement and post-
18 request-for-counsel statements does not somehow taint the statements that the trial
19 court did not suppress. See Oregon v. Elstad, 470 U.S. 298, 318 (1985) ("[A] suspect
20 who has once responded to unwarned yet uncoercive questioning is not thereby
21 disabled from waiving his rights and confessing after he has been given the requisite
22 Miranda warnings.").

23 　　　　Viewed in the light of the relevant standard of review, Petitioner has not made
24 a substantial showing that reasonable jurists would find the Court's assessment of the
25 constitutional claims debatable or wrong. Given that Petitioner has presented no
26 evidence to rebut the trial court's finding that his voluntary intoxication did not render
27 him incapable of exercising his free will, the issue of whether he knowingly and
28 voluntarily waived his Miranda rights is not a close call. Accordingly, the Court

**DENIES** Petitioner's request for a COA on his first issue.

### B.  The Prosecution's Excuse of African-American Jurors Did Not Violate Petitioner's Fourteenth Amendment Right to Due Process

Petitioner also asserts that the prosecution's excuse of two African-American venire members violated his right to due process, as interpreted by the Supreme Court in Batson v. Kentucky, 475 U.S. 79 (1986). (*Appl.* 5–6.) Specifically, Watkins contends that reasonable jurists would find this Court's decision—that Watkins failed to make out a prima facie case of discriminatory jury selection—debatable or wrong. (*Id.* 6.)

To establish a prima facie case that the state has exercised its peremptory challenges in a racially discriminatory manner, the defendant must demonstrate that (1) he is a member of a "cognizable racial group;" (2) the state used its peremptory strikes to exclude members of the defendant's racial group from the jury; and (3) the totality of the circumstances gives rise to an inference of impermissible discrimination. Batson, 475 U.S. at 98. On collateral review, the trial court's finding regarding whether a prima facie case has been made is entitled to a presumption of correctness. Tolbert v. Paige, 182 F.3d 677, 685 (9th Cir. 1999); see also Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

In denying Petitioner's Batson claim, the Court concluded that Petitioner failed to establish a prima facie case of impermissible racial discrimination. (*Order Adopting Report and Recommendation* 12–14.) While Petitioner is African-American, and the state used its peremptory strikes to exclude two African-American potential jurors, the totality of the circumstances suggests that the state had legitimate, non-discriminatory bases for striking the venire members. One juror appeared confused by the prosecutor's voir dire questioning and gave evasive responses to questions regarding the death penalty. (*Lodgment 4*, vol. 1 at 242–45.) The other juror expressed negative feelings about the jury summons process, the death penalty, and law enforcement. (*Lodgment*

4, vol. 4 at 667–68, 688–89, 693.) It is fair to say that the prosecutor would not have found either of these jurors suitable, regardless of their race.

Petitioner has failed to produce any evidence that the state exercised its peremptory challenges in a racially discriminatory manner. See Miller-El, 537 U.S. at 342–43 (discussing circumstantial evidence of racially discriminatory exercise of peremptory challenges). Given the presumption of correctness afforded to the trial court's determination regarding Petitioner's failure to establish a prima facie case—and Petitioner's failure to produce any evidence rebutting that presumption—this issue simply does not involve any close legal questions on which reasonable jurists could disagree. Accordingly, the Court **DENIES** Petitioner's request for a COA on his second issue.

### C. The Trial Court's Refusal to Instruct the Jury Regarding the Effect of Intoxication on Specific Intent was Warranted by the Evidence

Finally, Petitioner argues that he was denied due process when the trial court declined to instruct the jury regarding the effect of voluntary intoxication on specific intent. (*Appl.* at 7–16.)[1] In sum, Petitioner contends that a voluntary intoxication instruction (1) was warranted by the fact that he relied on intoxication as his sole theory of defense; and (2) was supported by circumstantial evidence. (*Id.*) These arguments are identical to those Petitioner offered in his Petition and Objections.

Evidence of a defendant's voluntary intoxication is relevant to negate the specific intent necessary to support a charge of first-degree murder; it does not act as an excuse to homicide. Cal. Penal Code § 22(b); People v. Boyer, 133 P.3d 581, 662 (Cal. 2006). However, the defendant must clear two substantial hurdles before the trial court is required to provide a voluntary intoxication jury instruction: (1) the defendant must produce "substantial evidence" of his voluntary intoxication; and (2) the defendant

---

[1] The Court has renumbered the pages of Petitioner's Application sequentially to aid in referring to the proper pages.

must produce evidence that his voluntary intoxication affected his "actual formation of specific intent." People v. Williams, 941 P.2d 752, 777 (Cal. 1997).

In denying Watkins's habeas corpus petition, the Court concluded that Petitioner failed to produce any direct or circumstantial evidence warranting a jury instruction on voluntary intoxication. (*Order Adopting Report and Recommendation* 15–17.) Defense witness Dr. Alan Abrams ("Dr. Abrams") testified that crack cocaine, phencyclidine (PCP), and alcohol were present in a urine sample taken from Petitioner during his custodial interrogation. (*Lodgment 1*, vol. 10 at 2028–33.) However, because the sample was taken some twenty-four hours *after* the murder, Dr. Abrams could not say with any degree of certainty whether Petitioner was intoxicated *at the time* he killed Lillie Mae Brown. (*Id.* at 2031.) In fact, two individuals who saw Watkins on the eve of the murder testified that Watkins did not appear intoxicated. (*Lodgment 1*, vol. 4 at 743; *Lodgment 1*, vol. 5 at 967.)[2]

The Court's initial decision on this issue did not involve any close legal questions. Here, the Court was not even required to weigh Petitioner's evidence to determine whether it was sufficiently "substantial" to warrant a voluntary intoxication jury instruction. This is because Petitioner failed to meet his initial burden of coming forward with *any* evidence that he was intoxicated at the time of his offense. In light of the complete lack of direct or circumstantial evidence justifying a voluntary intoxication jury instruction, the Court concludes that reasonable jurists would not find the Court's initial decision debatable or wrong. Accordingly, the Court **DENIES**

---

[2] Petitioner relies on People v. Sedeno, 518 P.2d 913, 921 (Cal. 1974), for the proposition that "the duty to give instructions, sua sponte, on particular defenses and their relevance to the charged offense arises . . . if it appears that the defendant is relying on such a defense." However, the great weight of more recent authority suggests that a defendant is only entitled to a jury instruction on voluntary intoxication where that instruction is supported by substantial evidence. People v. Williams, 941 P.2d 752, 777 (Cal. 1997); People v. Saille, 820 P.2d 588, 598 (Cal. 1991) (noting that the withdrawal of diminished capacity as a defense removed intoxication from the realm of defenses to crimes, thus requiring a jury instruction on intoxication only where there is evidence supporting that theory); See Hopper v. Evans, 456 U.S. 605, 611 (1982) ("[D]ue process requires that a lesser included offense be given *only* when the evidence warrants such an instruction." (emphasis in original)). Because Petitioner produced absolutely no direct or circumstantial evidence that he was intoxicated *at the time* that he killed Ms. Brown, he was not entitled to a jury instruction on voluntary intoxication.

Petitioner's request for a COA on his third and final issue.

### IV.  CONCLUSION AND ORDER

Petitioner's habeas petition did not raise any novel questions of law which were close calls or issues on which reasonable jurists could disagree.  For the foregoing reasons, the Court **DENIES** Petitioner's request for a Certificate of Appealability.

IT IS SO ORDERED

DATE: August 13, 2008

HON. THOMAS J. WHELAN
United States District Court
Southern District of California